1  ERIC J. AMDURSKY (S.B. #180288)
   LORI E. ROMLEY (S.B. #148447)
2  JUSTIN D. WALKER (S.B. #252268)
   O'MELVENY & MYERS LLP
3  2765 Sand Hill Road
   Menlo Park, California  94025
4  Telephone:  (650) 473-2600
   Fax:  (650) 473-2601
5  Email: eamdursky@omm.com
           lromley@omm.com
6          jwalker@omm.com

7  Attorneys for Plaintiff
   RIYA, INC.

8

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14  RIYA, INC., a California Corporation          Case No. _____

15                        Plaintiff,      **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES IN SUPPORT OF**
16        v.                              **PLAINTIFF RIYA, INC.'S EX PARTE**
                                          **APPLICATION FOR TEMPORARY**
17  DEBORAH BETH KIRSCH,                  **RESTRAINING ORDER AND ORDER TO**
                                          **SHOW CAUSE RE:  PRELIMINARY**
18                        Defendant.      **INJUNCTION**

19

20

21

22

23

24

25

26

27

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND FACTS ...................................................................... 3

    A.    Riya Operates a Unique and Powerful Visual Search Engine ................. 3

    B.    The Parties' Employment Relationship And The Employee Proprietary Information and Inventions Assignment Agreement ............................. 4

    C.    Riya's Employee Handbook Prohibits Misappropriation of Proprietary Information ........................................................................................ 6

    D.    Riya Terminates Kirsch's Employment Due To A Confidentiality Breach ........... 7

    E.    The Discovery of Kirsch's Unlawful Activity ...................................... 7

    F.    Kirsch's Continuing Threat To Misappropriate Riya's Confidential And Proprietary Business And Trade Secret Information ............................. 8

III.  LEGAL ARGUMENT ......................................................................... 9

    A.    There Is A Strong Likelihood That Riya Will Prevail On The Merits Of Its Claims ............................................................................................ 10

        1.    Riya has a strong likelihood of prevailing on its claim for violation of the Computer Fraud and Abuse Act .......................................... 10

        2.    Riya is likely to prevail on its claim under the California Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426-3426.11) ...................... 12

        3.    Riya is likely to prevail on its claim of breach of the PIIA ............... 15

    B.    Riya Will Suffer Irreparable Harm If Interim Relief Is Not Granted ................. 17

    C.    An Order To Kirsch Not To Use Or Disclose Riya's Confidential and Proprietary Business and Trade Secrets Is Necessary To Preserve The Status Quo And Protect Riya's Trade Secrets .................................... 18

    D.    An Order To Preserve Evidence Is Necessary To Preserve The Status Quo And Protect Riya's Trade Secrets ............................................ 19

    E.    An Order Requiring Kirsch To Return All Of Riya's Confidential and Proprietary Business and Trade Secret Information Is Necessary To Preserve The Status Quo And Protect Riya's Trade Secrets.................. 21

IV.   CONCLUSION .................................................................................. 21

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

# TABLE OF AUTHORITIES

**Page**

### CASES

*Abba Rubber Co. v. Seaquist,*
235 Cal. App. 3d 1 (1991)...................................................................................... 12

*Apple Computer, Inc. v. Formula Int'l, Inc.,*
725 F.2d 521 (9th Cir. 1984)................................................................................ 17

*Brown Jordan Int'l, Inc. v. The Mind's Eye Interiors, Inc.,*
236 F. Supp. 2d 1152 (D. Haw. 2002) .................................................................. 9

*Courtesy Temporary Serv., Inc. v. Camacho,*
222 Cal. App. 3d 1278 (1990)............................................................................. 17

*Dodge, Warren & Peters Ins. Servs., Inc. v. Riley,*
105 Cal. App. 4th 1414 (2003)........................................................................ 19, 20

*Erich v. Granoff,*
109 Cal. App. 3d 920 (1980)............................................................................... 16

*FPI Dev., Inc. v. Nakashima,*
231 Cal. App. 3d 367 (1991)............................................................................... 15

*Gilder v. PGA Tour, Inc.,*
936 F.2d 417 (9th Cir. 1991)................................................................................. 9

*Imi-Tech Corp. v. Gagliani,*
691 F. Supp. 214 (S.D. Cal. 1986)....................................................................... 17

*K-2 Ski Co. v. Head Ski Co., Inc.,*
506 F.2d 471 (9th Cir. 1974)........................................................................... 13, 17

*MAI Sys. Corp. v. Peak Computer, Inc.,*
991 F.2d 511 (9th Cir. 1993)............................................................................... 13

*Morlife, Inc. v. Perry,*
56 Cal. App. 4th 1514 (1997)........................................................................ 12, 13

*N. Atl. Instruments, Inc. v. Haber,*
188 F.3d 38 (2d Cir. 1999)................................................................................. 17

*Nike, Inc. v. McCarthy,*
379 F.3d 576 (9th Cir. 2004).......................................................................... 9, 17

*Northpoint Homeowners Ass'n v. Super. Ct.,*
95 Cal. App. 3d 241 (1979).................................................................................. 20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,*
290 F.3d 578 (3d Cir. 2002)................................................................................ 19

*Pac. Aerospace & Elec., Inc. v. Taylor,*
295 F. Supp. 2d 1188 (E.D. Wash. 2003) ........................................................... 10

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,*
143 F.3d 800 (3d Cir. 1998)................................................................................ 19

*Playboy Enters, Inc. v. Welles,*
60 F. Supp. 2d 1050 (S.D. Cal. 1999)
*aff'd in part and rev'd in part on other grounds,* 279 F.3d 796 (9th Cir. 2002) .................... 20

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

# TABLE OF AUTHORITIES
## (continued)

Page

*PMC, Inc. v. Kadisha,*
  78 Cal. App. 4th 1368 (2000).................................................................................... 18

*Religious Tech. Ctr. v. Netcom On-Line Commc'ns Servs., Inc.,*
  923 F. Supp. 1231 (N.D. Cal. 1995) ......................................................................... 21

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,*
  119 F. Supp. 2d 1121 (W.D. Wash. 2000).................................................................. 10

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
  240 F.3d 832 (9th Cir. 2001)...................................................................................... 17

*Union Oil Co. v. Reconstruction Oil Co.,*
  4 Cal. 2d 541 (1935) .................................................................................................. 20

*United States Golf Ass'n v. Arroyo Software Corp.,*
  69 Cal. App. 4th 607 (1999)....................................................................................... 17

*Whyte v. Schlage Lock Co.,*
  101 Cal. App. 4th 1443 (2002).................................................................................. 13

## STATUTES

18 U.S.C. § 1030(a)(5)(B)(i)........................................................................................... 10

18 U.S.C. § 1030(g) ........................................................................................................ 10

Cal. Civ. Code § 3426.1 .................................................................................................. 14

Cal. Civ. Code § 3426.1(a) ............................................................................................. 14

Cal. Civ. Code § 3426.1(b)(1)......................................................................................... 14

Cal. Civ. Code § 3426.1(b)(2)................................................................................... 14, 15

Cal. Civ. Code § 3426.1(d) ............................................................................................. 12

Cal. Civ. Code § 3426.2(a) ............................................................................................. 19

## OTHER AUTHORITIES

1 Witkin, *Summary of Calif. Law* § 616, p. 525 (8th ed. 1973).................................... 16

4 Witkin, *Cal. Procedure: Pleading* §§ 467-482, pp. 507-519 (3d ed. 1985) ............... 15

8 Grossman & Van Alstyne, *Cal. Practice: Pleading- Civil Actions* §§ 1011-1026,
  pp. 210-245 (2d ed. 1981).......................................................................................... 15

Restatement of Contracts § 312 ..................................................................................... 16

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

## I.    **INTRODUCTION**

This action presents a clear cut case of trade secret misappropriation.  While defendant Deborah Beth Kirsch ("Kirsch") worked in an executive position at plaintiff Riya, Inc. ("Riya"), she was extensively involved with Riya's core trade secrets relating to marketing, sales and Riya's prized product, the Like.com website and search engine.  She was provided highly confidential information about Riya on a daily basis, such as its daily financial reports, board packages, Riya's business plans and strategy, and the terms of the deals that Riya structured with its customers.  In complete disregard of the trust that Riya placed in her, Kirsch took Riya's confidential and proprietary business and trade secret information and turned it over to a friend of hers, who happens to be the President and Founder of a company that has two websites that compete directly with Riya.  Kirsch offered to help the competitor build the same powerful, unique and successful search engine that Riya had developed, and promised to meet with him after she left Riya's employment to teach him everything that she had learned at Riya.  If those betrayals were not enough, Kirsch also admitted to stealing Riya's software.

Kirsch knew that her actions were wrong -- indeed, they violated an agreement that she signed when she commenced employment with Riya -- as she requested in many of these messages that the recipient keep the information under wraps.  In one, Kirsch stated that the information was "so under frienDA," meaning that she knew that she was disclosing the information without the benefit of a non-disclosure agreement.  In another, after she disclosed the confidential information, she wrote: "shhhhhh."  Further, in a message sent to a subordinate when she volunteered to and did send him materials meant for management's eyes only, Kirsch told him that this had to stay between them and sent the materials to his personal email address.

When Riya discovered Kirsch's wrongdoing, Riya called her to discuss the issues, but Kirsch neither took the call nor returned it.  Riya also sent her an email, telling her that it had found extensive instant messages on her company laptop computer in which she divulged Riya confidential and trade secret information to a competitor.  Kirsch's response to the email was identical to her response to the telephone call -- she ignored it.  Finally, Riya's counsel sent a letter to Kirsch demanding that Kirsch provide an accounting of all Riya confidential and

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1    proprietary business and trade secret information that she took from Riya, as well as assurances

2    that she would not further use or disclose that information and that she would preserve all

3    relevant evidence. Again, Kirsch did not respond. Instead, on the day that she should have

4    provided the information that Riya requested, she had counsel send a letter. But that letter failed

5    to provide either the accounting or the assurances Riya needed and instead said that he would get

6    back to Riya sometime during the next week. No further response has been provided.

7         Unfortunately, Riya cannot afford to wait around while Kirsch continues to possess its

8    confidential and trade secret information, especially because she previously stated she was going

9    to share it all with a competitor. Riya faces real and tangible damage from Kirsch's disclosures to

10   a competitor and if Kirsch discloses enough information, Riya will lose its competitive edge.

11   Riya provides the first truly visual shopping website that is powered by a unique search engine,

12   which permits consumers to locate items through pictures. The search engine uses proprietary

13   object recognition software to find similar items for the consumer to consider purchasing. Once

14   the consumer decides what he will purchase, Riya's highly specialized algorithms allow the

15   consumer to click through to the contracting merchant's website. No other website has the

16   capabilities that Riya has, and none are using the algorithms that permit Riya's consumers to

17   execute the click through rapidly, thereby generating more revenue for Riya, as it is paid by its

18   contracting merchants on a click through basis.

19        Riya's strategy is to be acquired and as the only shopping website that offers these unique

20   advantages, it likely will be acquired and at a premium price. If Kirsch discloses sufficient Riya

21   confidential and trade secret information that permits a competitor to replicate some or all of

22   Riya's capabilities, the premium on acquisition will disappear and cause Riya's value to tumble

23   by $10-20 million. Because Riya is still a small company with only 25 employees in total, Riya

24   could be put out of business if faced with stiff competition from a larger and more established

25   company, based on its own proprietary information.

26        Riya brings various claims against Kirsch based on her misappropriation of Riya's

27   confidential and trade secret information, and has a strong likelihood of prevailing on those

28   claims. Given Kirsch's own written admissions, it is beyond dispute that she accessed Riya's

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 2 -

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1     computer system to wrongfully obtain Riya's confidential and trade secret information and that

2     she transmitted that information to a competitor.  That conduct violates the Computer Fraud and

3     Abuse Act, California trade secret law, as well as the agreement that she signed with Riya.

4     Because Kirsch has no right to this information in the first instance, she will suffer *no* harm if

5     Riya's application is granted.  Riya, however will suffer significant and irreparable harm if Kirsch

6     is not enjoined.

7          Thus, Riya asks this Court to enjoin Kirsch from taking action that she has no right to

8     take and contracted not to take, and prohibit her from further misappropriation of Riya's

9     confidential and trade secret information, and require her to return all such information to Riya.

10     Further, Riya requests that the Court enter a Preservation Order to require Kirsch to preserve the

11     relevant evidence.

12    **II.**      <u>**BACKGROUND FACTS**</u>

13       **A.**     **Riya Operates a Unique and Powerful Visual Search Engine.**

14

15          Riya is a small, privately-held company that was founded on August 6, 2004.

Declaration of Munjal Shah ("Shah Decl."), filed herewith, ¶ 3.  Riya currently has 23 employees

16

17     in the United States, along with two employees in India.  *Id.*  Riya's prized website, Like.com,

offers customers the opportunity to shop through a visual search engine.  *Id.*  Like.com is the first

18

19     true visual search engine on the market today.  *Id.* ¶ 4.  Shoppers are able to log onto Like.com

and click on pictures of products that they like.  The search engine uses Riya's proprietary

20

21     Likeness Technology™ (which searches by image instead of text), Like Detail™ (which searches

by specific features, such as a buckle, heel or watch bezel) and Like Color™ (which searches by

22

23     color variants in the items chosen by the customer) to search for other items that are similar,

which the consumer might want to purchase.  *Id.*  That specialized and unique technology creates

24

25     a digital signature that describes the photo's contents and enables a more accurate search for

similar looking items and products.  *Id.*  Riya makes money through Like.com by sending leads to

26

27     the merchants who sign up with the site.  *Id.*  Once a consumer clicks on a product to purchase,

Riya's powerful search engine clicks the consumer through to the merchant's website.  *Id.*

28

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

Riya's product has been immensely successful. Shah Decl. ¶ 5. Riya attributes this success to its source code that contains unique and proprietary algorithms. *Id.* Riya believes that Like.com is currently the only search engine that has those algorithms, which permit Like.com consumers to quickly and reliably click through to the merchant's website. *Id.*

**B.     The Parties' Employment Relationship And The Employee Proprietary Information and Inventions Assignment Agreement.**

In 2006, Riya hired Kirsch as its Director of Marketing and she later held the position of Vice President of Marketing and Sales. Shah Decl. ¶ 6. She was a member of Riya's Executive Staff and regularly attended the company's board of director meetings. *Id.* Prior to those meetings, Kirsch received board packages, which contained highly confidential and proprietary business information. *Id.* Kirsch also received daily financial reports generated by the company. *Id.* Indeed, Kirsch had a separate email file on her company laptop computer for these daily reports and had at least 192 reports archived. Declaration of Lori E. Romley ("Romley Decl."), filed herewith, ¶ 4. Kirsch was also deeply involved with Riya's core trade secrets with respect to marketing and distribution. Shah Decl. ¶ 6. Further, Kirsch spent a great deal of time assisting the engineering staff, who were working on the core trade secrets of the search engine, including the proprietary algorithms. *Id.* In her executive position, Kirsch was privy to Riya's confidential, proprietary and trade secret information and had access to virtually all of Riya's carefully guarded information and trade secrets. *Id.*

Riya has implemented numerous precautions to protect its trade secrets. Declaration of Andrew Miller ("Miller Decl."), filed herewith, ¶¶ 4-7. As part of these efforts, Riya requires each of its employees to sign the Company's Proprietary Information and Inventions Assignment Agreement ("PIIA"). Shah Decl. ¶ 7. Consistent with these efforts, Riya and Kirsch entered into the PIIA on September 14, 2006. Shah Decl., Ex. A. By executing the PIIA, Kirsch was contractually bound to several conditions.

First, the PIIA defines "Proprietary Information" to include, but not limited to, "information (whether conveyed orally or in writing) about algorithms, application programming interfaces, protocols, trade secrets, computer software, designs, technology, ideas, know-how,

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1 products, services, processes, data, techniques, improvements, inventions (whether patentable or

2 not), works of authorship, business and product development plans, the salaries and terms of

3 compensation of other employees, customer lists and other information concerning the

4 Company's actual or anticipated business, research or development, or that is received in

5 confidence by or for the Company from any other person." Shah Decl., Ex. A § 1. In the PIIA,

6 Kirsch expressly agreed that her employment with Riya created a relationship of "confidence and

7 trust" between her and the Company with respect to Proprietary Information. *Id.* Further, Kirsch

8 agreed to keep that "confidence and trust" and to not use or disclose any Proprietary Information

9 (or anything relating to it) without the prior written consent of Riya. *Id.*, Ex. A § 3.1.

10     <u>Second</u>, it defines "Company Materials" as "documents or other media or tangible items

11 that contain or embody Proprietary Information or any other information concerning the business,

12 operations or plans of the Company, whether such documents have been prepared by me or by

13 others. . . . [and] include[s], without limitation, blueprints, drawings, photographs, charts, graphs,

14 notebooks, customer lists, computer software, media or printouts, sound recordings and other

15 printed, typewritten or handwritten documents, as well as sample, prototypes, models, products

16 and the like." Shah Decl., Ex. A § 2. With respect to Company Materials, Kirsch promised to not

17 remove them from Riya or to deliver Company Materials to any person or entity outside the

18 Company, except as Kirsch was required to do in connection with performing her job duties for

19 Riya. *Id.* Kirsch further agreed that, immediately upon the termination of her employment, she

20 would return "all Company Materials, apparatus, equipment and other physical property, or any

21 reproductions of such property, excepting only (i) my personal copies of records relating to my

22 compensation; (ii) my personal copies of any materials previously distributed generally to

23 stockholders of the Company; and (iii) my copy of this Agreement." *Id.*, Ex. A § 3.2

24     <u>Third</u>, Kirsch expressly agreed in the PIIA that she would keep in "confidence and trust"

25 and would not use or disclose *any* Proprietary Information or anything relating to it without

26 Riya's prior written consent, at all times both during and after her employment with Riya. Shah

27 Decl., Ex. A § 3.1.

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 5 -

1    <u>Fourth</u>, during the term of Kirsch's employment with Riya, the PIAA prohibited Kirsch

2    from engaging in any employment, business, or activity that "is in any way competitive with the

3    business or proposed business of the Company," and "not assist any other person or organization

4    in competing with the Company or in preparing to engage in competition with the business or

5    proposed business of the Company." Shah Decl., Ex. A § 5.

6    <u>Fifth</u>, in the PIIA, Kirsch agreed that "[b]ecause my services are personal and unique and

7    because I may have access to and become acquainted with the Proprietary Information of the

8    Company, the Company *shall have the right to enforce this Agreement and any of its provisions*

9    *by injunction*, specific performance or other equitable relief, *without bond*, without prejudice to

10    any other rights and remedies that the Company may have for a breach of this Agreement." Shah

11    Decl., Ex. A § 13 (emphasis added).

### C.    Riya's Employee Handbook Prohibits Misappropriation of Proprietary Information.

12

13    Tri-Net administers the benefits for Riya and as part of the new employee registration

14    process online with Tri-Net, employees are required to accept a copy of Riya's Employment

15    Handbook. Shah Decl. ¶ 8. Kirsch received a copy of the Employee Handbook through this

16    process. *Id.* The Employee Handbook sets forth Riya's ethical standards, including "[t]o protect

17    confidential information," and it explains that misconduct includes, "[d]amaging, destroying,

18    removing without authority, or failing to return, any property (physical or intellectual) belonging

19    to the company . . . ."

20    The Employee Handbook also states:

21

22    > As an employee, you may learn information about the company that
     > is not known by the general public. This information may include
23    > trade secrets, business plans, financial results, marketing and sales
     > plans, or acquisition or disposition of company assets. Regardless
24    > of whether this type of information is specifically classified as
     > confidential, it is each employee's responsibility to keep this
25    > information in confidence. All items such as manuals, reports,
     > records and statements, other than those made available to the
26    > general public, are the property of the company, generally to be
     > kept at the company's place of business and are to be returned to
27    > the company when requested and upon termination.

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1    Riya employees are expressly forbidden in the Employee Handbook from: "Using

2    information developed or learned on the job for personal or familial benefit. This includes the use

3    of company databases, financial information, and intellectual property" and from "Sharing

4    confidential or proprietary company related information with business associates or

5    representatives of other companies."

6    Riya's Employee Handbook further states that:

7    
> To jeopardize the security of restricted information is detrimental to
> company and employee security. We need all employees to do
> their part in protecting such information by not disclosing any trade
> secrets or confidential information or using it in any manner that is
> unauthorized or detrimental to the best interests of the company.
> Some employees who have access to confidential, sensitive, or
> proprietary information about the company or its clients, processes,
> and employees may also need to sign a Proprietary Information and
> Inventions Agreement (PIIA) as a condition of employment.
> Employees who disclose trade secrets or confidential company
> information may be subject to disciplinary action, up to and
> including discharge.

8

9

10

11

12

13

14    Riya's employees are also told in the Employee Handbook that: "All business equipment,

15    electronic and telephone communications systems, and all communications and stored

16    information transmitted, received, or contained in the company's information systems are the

17    company's property and are to be used for job-related purposes unless otherwise authorized by

18    the company." Finally, the Employee Handbook demands that: "If you leave our employ, you

19    will need to return any company property in your possession."

20    **D.    Riya Terminates Kirsch's Employment Due To A Confidentiality Breach.**

21    In early December 2007, Riya discovered that Kirsch had inappropriately disclosed

22    confidential management materials to a non-managerial employee. When confronted with that

23    fact on or about December 11, 2007, Kirsch did not deny the truth of the accusation and Riya

24    determined that it had no choice but to terminate her employment, effective December 31, 2007.

25    Shah Decl. ¶¶ 14-15.

26    **E.    The Discovery of Kirsch's Unlawful Activity.**

27    After Kirsch left Riya, on January 11, 2008, Riya opened Kirsch's company laptop

28    computer to locate a particular document, and discovered that Kirsch had been stealing the

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 7 -

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1  company's confidential and proprietary business and trade secret information, for the benefit of a

2  direct competitor, 77Blue., which operates two shopping portals - cashbaq.com and

3  anycoupons.com. Shah Decl. ¶ 16. In an instant message (an "IM") sent on December 11, 2007,

4  Kirsch advised David Lewis, the President and Founder of 77Blue that his company should build

5  a search engine similar to what Riya had built -- and offered generously to give away Riya's most

6  deeply guarded secrets: "I'll tell you how." Shah Decl. ¶ 18; Romley Decl., Ex. D.

7      In other IMs that were written while she was still employed by Riya, Kirsch disclosed

8  Riya's confidential deal and financial information. Shah Decl. ¶ 19; Romley Decl., Ex. E. On

9  December 16, 2007 -- after Kirsch had already learned the severe consequence for breaching her

10  duties of confidentiality -- she offered to meet with Lewis in January 2008 to disclose Riya's

11  company secrets and share "what I learned at Riya." Shah Decl. ¶ 18; Romley Decl., Ex. G.

12  Finally, Kirsch admitted to stealing Riya's software. Shah Decl. ¶ 19; Romley Decl., Ex. H.

13  Kirsch knew that these disclosures were forbidden and inappropriate, as she tempered them with

14  statements such as "shhhhh" and this is so under "frieNDA" (referring to an informal "NDA,"

15  where the information is disclosed and is supposed to be kept secret, but there is no formal

16  agreement in place).

17         **F.**    **Kirsch's Continuing Threat To Misappropriate Riya's Confidential And**
              **Proprietary Business And Trade Secret Information.**

18

19      Riya does not yet know the full extent of Kirsch's misappropriation. It does know,

20  however, that she holds much of Riya's confidential and proprietary business and trade secret

21  information in her head, having served as the Director of Marketing and Vice President of

22  Marketing and Sales. Kirsch also promised her friend David Lewis -- the owner of a business

23  that supports two competing shopping websites -- to share with him in January (after her

24  termination with Riya), all that she learned at Riya.

25      Riya also knows that Kirsch admitted to stealing Riya's software -- although without

26  discovery, Riya remains in the dark regarding how much software was pilfered, or which

27  software. Unless and until Riya recovers all such software, it faces the risk that Kirsch will

28  continue to voluntarily hand out Riya's trade secret information. Riya also does not yet know

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1  whether Kirsch copied Riya's confidential and proprietary business trade secret information onto

2  CD Roms for her, her new employer's, or Lewis's use.  Discovery will reveal the extent of such

3  copying.

4          There is also evidence that strongly suggests that Kirsch downloaded contact information

5  for Riya's customer merchants, including the name, phone number and Riya's contact person for

6  that merchant.  Romley Decl. ¶ 6.  There is nothing at this point to stop Kirsch from competing

7  directly through another employer, or permitting Lewis to compete, with Riya by stealing Riya's

8  merchants.  Kirsch knows the details of the deals that Riya made with these merchants, including

9  how the pricing is structured, and now can easily structure a deal with some or all of these

10  merchants on slightly more favorable terms, which may cause the merchants to leave Riya.

11  **III.    LEGAL ARGUMENT**

12          Based on the foregoing facts, Riya is entitled to a preliminary injunction and temporary

13  restraining order.  "To obtain a preliminary injunction, [Riya] must show either (1) 'a likelihood

14  of success on the merits and the possibility of irreparable injury' or (2) 'the existence of serious

15  questions going to the merits and the balance of hardships tipping in [Riya's] favor.'"  *Nike, Inc.*

16  *v. McCarthy*, 379 F.3d 576, 580 (9th Cir. 2004) (quoting *Gilder v. PGA Tour, Inc.*, 936 F.2d 417,

17  422 (9th Cir. 1991)).  "'These two alternatives represent extremes of a single continuum, rather

18  than two separate tests.'"  *Id.* (citation omitted).  "The standard for issuing a temporary

19  restraining order is identical to the standard for issuing a preliminary injunction."  *Brown Jordan*

20  *Int'l, Inc. v. The Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002).

21  Although Riya is entitled to a temporary restraining order and a preliminary injunction under

22  either view, its likelihood of prevailing on the merits is so strong that the second prong becomes

23  superfluous.

24

25

26

27

28

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

**A.    There Is A Strong Likelihood That Riya Will Prevail On The Merits Of Its Claims.**

**1.    Riya has a strong likelihood of prevailing on its claim for violation of the Computer Fraud and Abuse Act.**

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(5)(B)(i), makes it unlawful to intentionally access a protected computer without authorization, and as a result cause damage aggregating at least $5,000 in value. 18 U.S.C. § 1030(g) provides, "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."

The instant case is indistinguishable from *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000) ("*Shurgard*"). There, plaintiff and defendant were competitors in the self-storage business. The plaintiff brought a cause of action in federal court under the CFAA alleging that "some of these employees, while still working for the plaintiff, used the plaintiff's computers to send trade secrets to the defendant via e-mail." *Id.* at 1122. The defendant argued that the CFAA did not apply, claiming that the plaintiff's employees had authorization to access the plaintiff's computer systems. *Id.* at 1124. The court disagreed, finding that "they lost their authorization and were 'without authorization' when they allegedly obtained and sent the proprietary information to the defendant via e-mail." *Id.* at 1125. That holding is rooted in the plain language of the statute:

> [T]he defendant asserts that the legislative history of this section of the CFAA shows that it is only intended to apply to "outsiders," and thus would not apply to employees. However, there is no ambiguity in the statute as to when a party is liable, ("*Whoever ... intentionally access....*") so this argument lacks merit.

*Id.* at 1126. The court concluded: "In sum, this passage makes clear that the CFAA was intended to encompass actions such as those allegedly undertaken by the present defendant. The legislative history of the CFAA comports with the plain meaning of the statute." *Id.* at 1129; *accord Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1196 (E.D. Wash. 2003) ("Since the last amendment of the statute, the majority of CFAA cases still involve 'classic' hacking activities. Employers, however, are increasingly taking advantage of the CFAA's civil

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1    remedies to sue former employees and their new companies who seek a competitive edge through

2    wrongful use of information from the former employer's computer system." (footnote omitted)).

3        Similarly here, Kirsch made unauthorized access to Riya's protected computer systems for

4    the purpose of distributing Riya's confidential and proprietary business and trade secret

5    information and, on her own admission, stealing Riya's software for the purpose of unfairly

6    competing with Riya. These thefts could result in tens of millions of dollars of damage to Riya

7    and negatively impact Riya's ability to be acquired. Unbeknownst to Riya, Kirsch was secretly

8    stealing this information and making preparations to unlawfully disclose such information to

9    permit at least anycoupons.com and cashbaq.com to compete unfairly with Riya while still

10    employed by Riya. There is no conceivable argument by which Kirsch could claim that Riya

11    authorized her to secretly engage in wholesale copying of software and to disclose highly

12    confidential deal and financial information. On the contrary, Riya terminated Kirsch's

13    employment for a far less egregious breach of her confidentiality obligations (*i.e.* sharing

14    confidential information *internally* with a non-managerial employee). Much less can Kirsch

15    argue that she was authorized to send any confidential and proprietary business and trade secret

16    information outside the company, let alone for the purpose of allowing Lewis to use it to more

17    effectively compete with Riya through 77Blue's two competing search portals.

18        To the contrary, Kirsch expressly contracted to keep such information confidential:

19
20
21
22
> At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company except as may be necessary and appropriate in the ordinary course of performing my duties to the Company.

23    Shah Decl., Ex. A § 3.1. Consistently, in the Employee Handbook, Kirsch is forbidden from

24    revealing such information to a representative of another company or to use it for personal gain.

25    *Id.,* Ex. B. Kirsch's use of her personal e-mail account to send certain of the information, and her

26    comments such as "shhhhh" and this is so under "frieNDA," when she disclosed Riya's

27    Proprietary Information to a competitor, indicates that she was well aware that she was making an

28    unauthorized access of Riya's computers. Romley Decl., Ex. E. As such, Riya has established a

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 11 -

1   strong likelihood of prevailing on the merits of its claim under the CFAA – making both federal

2   jurisdiction and provisional injunctive relief appropriate.

### 2.   Riya is likely to prevail on its claim under the California Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426-3426.11).

5   The California Uniform Trade Secrets Act ("UTSA"), California Civil Code section

6   3426.1(d), provides:

> Trade secret means information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

11  "Thus, the definition consists of three elements:  (a) information (b) which is valuable because

12  unknown to others and (c) which the owner has attempted to keep secret." *Abba Rubber Co. v.*

13  *Seaquist*, 235 Cal. App. 3d 1, 18 (1991).  The first element - that the trade secrets at issue are

14  "information" – is easily satisfied.  At issue is software copied from Riya's computer systems and

15  confidential and proprietary business and trade secret information.  This information includes:

16  (1) the details of deals that Riya was negotiating with merchants; (2) the details of Riya's

17  financial status; and (3) proprietary software.

18  The second element, that this information is valuable because it is not generally known, is

19  also satisfied.  "As a general principle, the more difficult information is to obtain, and the more

20  time and resources expended by an employer in gathering it, the more likely a court will find such

21  information constitutes a trade secret." *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522

22  (1997).  To say that the information taken by Defendants was "valuable" does not even begin to

23  describe it.  By disclosing to a competitor how Riya structures deals with its customer merchants,

24  how it is doing financially, offering to help a competitor build a competing search engine and to

25  disclose all of the information that Kirsch learned at Riya, Kirsch is essentially handing out the

26  blueprints for developing a competing search engine.  Defendants would be hard-pressed to argue

27  that this information was not "valuable."  Similarly, the information is not generally known.  To

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1    the contrary, the information was developed by Riya at great expense and is subject to protections

2    for its secrecy.

3        The final element, that Riya has attempted to keep the information secret, is also satisfied.

4    Indeed, as set forth below, the security measures employed by Riya are far greater than those that

5    have previously been approved as sufficient. *See, e.g., MAI Sys. Corp. v. Peak Computer, Inc.*,

6    991 F.2d 511, 521 (9th Cir. 1993) ("MAI took reasonable steps to insure the secrecy to this

7    information as required by the UTSA.  MAI required its employees to sign confidentiality

8    agreements respecting its trade secrets, including the Customer Database.  Thus, under the UTSA,

9    the MAI Customer Database constitutes a trade secret."); *K-2 Ski Co. v. Head Ski Co., Inc.*, 506

10   F.2d 471, 474 (9th Cir. 1974) ("The district court also found that even though the security at the

11   plant was not tight, this did not destroy secrecy because the plant was located in a remote area.

12   None of these findings are clearly erroneous."); *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th

13   1443, 1454 (2002) ("Requiring employees to sign confidentiality agreements is a reasonable step

14   to ensure secrecy."); *Morlife*, 56 Cal. App. 4th at 1522-23 (Storing trade secrets "on computer

15   with restricted access" and including a "confidentiality provision" in employment contracts were

16   "reasonable steps to protect the information . . . from disclosure.").

17       Due to the nature of Riya's business, Riya must protect the secrecy of its many valuable

18   trade secrets and other confidential and proprietary materials in its possession.  In particular, Riya

19   goes to great lengths to protect its electronic information and the security of its computer

20   networks from unauthorized access and/or distribution, including the trade secret materials and

21   confidential communications on its computer networks and shared between its personnel.  Shah

22   Decl. ¶ 21; Miller Decl. ¶¶ 4-7.  When hired, employees are required to sign the PIIA, in which

23   each employee agrees to keep confidential all of Riya's confidential and proprietary business and

24   trade secret information, and they are provided with the Employee Handbook, which also

25   prohibits them from disclosing such information.  Shah Decl. ¶ 22, Ex. B.  This proprietary

26   information is only disclosed outside of Riya when necessary, and then only pursuant to strict

27   non-disclosure agreements. *Id.*

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 13 -

1    Access to Riya's office in San Mateo is permitted only with a key code or key. Shah Decl.

2    ¶ 23; Miller Decl. ¶ 3. Cornerstone Properties provides the physical security for the office. *Id.*

3    Riya's electronic communications and data are protected from unauthorized third party access

4    (*i.e.,* hacking) by a firewall that prevents unauthorized inbound internet traffic from reaching

5    Riya's computer networks. Shah Decl. ¶ 25; Miller Decl. ¶ 5. All of Riya's core trade secrets,

6    including but not limited to the algorithms, source code, and source code control are located in a

7    secure data center. Shah Decl. ¶ 24; Miller Decl. ¶ 4. To gain access to the data center, an

8    employee must have a swipe card, pass a biometrics identification and then once inside, have a

9    special key to gain access to the metal cage wherein certain trade secrets can be accessed. *Id.*

10   Kirsch also had electronic access to such information once she was securely behind Riya's

11   firewall, through email and the Wiki, which is essentially an online database. Shah Decl. ¶ 24;

12   Miller Decl. ¶ 5.

13       This is not a close case. The information at issue comprises information generally

14   accepted as trade secrets, including  Riya's deal structures and pricing information.

15       California Civil Code section 3426.1 sets forth a number of ways in which trade secrets

16   may be misappropriated. First, misappropriation occurs by "[a]quisition of a trade secret of

17   another by a person who knows or has reason to know that the trade secret was acquired by

18   improper means." Cal. Civ. Code § 3426.1(b)(1). "'Improper' means includes theft, bribery,

19   misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

20   through electronic or other means." Cal. Civ. Code § 3426.1(a). Riya is likely to prevail on its

21   claim of misappropriation against Kirsch under section 3426.1(b)(1) on the grounds that she

22   misappropriated Riya's trade secrets and acknowledged that she had done so by improper means.

23   Indeed, she conceded to Lewis that she was stealing Riya's software, which she previously

24   acknowledged in the PIIA constituted Riya's trade secrets.

25       Second, misappropriation occurs by "[d]isclosure or use of a trade secret of another

26   without express or implied consent by a person" whose knowledge was "[a]cquired under

27   circumstances giving rise to a duty to maintain its secrecy or limit its use." Cal. Civ. Code

28   § 3426.1(b)(2). Riya is likely to prevail on its claim of misappropriation of trade secrets against

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1   Kirsch under section 3426.1(b)(2) on the grounds that she disclosed Riya's trade secrets to a

2   competitor, with full knowledge that she had acquired the trade secrets under circumstances

3   giving rise to a duty to maintain secrecy – namely her employment with Riya (including the PIIA

4   that she signed).

5       **3.**     **Riya is likely to prevail on its claim of breach of the PIIA.**

6         In an action for breach of contract, "the plaintiff must plead the existence of a contract, its

7   terms which establish the obligation in issue, the occurrence of any conditions precedent to

8   enforcement of the obligation, and the breach of that obligation." *FPI Dev., Inc. v. Nakashima*,

9   231 Cal. App. 3d 367, 383 (1991) (citing 4 Witkin, *Cal. Procedure: Pleading* §§ 467-482, pp.

10  507-519 (3d ed. 1985)); 8 Grossman & Van Alstyne, *Cal. Practice: Pleading Civil Actions*

11  §§ 1011-1026, pp. 210-245 (2d ed. 1981)).  Riya can establish each of these elements of its claim

12  for breach of contract against Kirsch.

13        In the case of a written contract, "the allegation of execution of the [contract] alleges the

14  existence of a contract, [and] the incorporation of a copy of the [contract] alleges its terms." *Id.*

15  In this case, Kirsch executed the PIIA.  Shah Decl. ¶ 7, Ex. A.  By executing the PIIA, Kirsch

16  acknowledged the vital importance to Riya that she maintain the confidentiality of Riya's

17  Proprietary Information and Company Materials, which expressly include not only "trade secrets"

18  generally, but more specifically its "inventions," "specifications," "data," "customer lists" and

19  "computer software" – the specific trade secrets at issue here.  *Id.* § 1.  Moreover, Company

20  Materials are defined to include "information concerning the business, operations or plans of the

21  Company, whether such documents have been prepared by me or by others . . . [and] include[s],

22  without limitation, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists,

23  computer software, media or printouts, sound recordings and other printed, typewritten or

24  handwritten documents, as well as sample, prototypes, models, products and the like." *Id.* § 2.

25  Kirsch expressly acknowledged and understood that her employment with Riya "create[d] a

26  relationship of confidence and trust between me and the Company with respect to Proprietary

27  Information." *Id.* § 1.

28        Kirsch also agreed in the PIIA that she would "not use or disclose any Proprietary

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 15 -

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1    Information or anything relating to it without the prior written consent of an officer" of the

2    company" (Shah Decl., Ex. A § 3.1) and that she would " not remove any Company Materials

3    from the business premises of the Company or deliver any Company Materials to any person or

4    entity outside the Company." *Id.* § 3.2. Further, Kirsch agreed that during her employment, she

5    would "not engage in any employment, business, or activity that is in any way competitive with

6    the business or proposed business of the Company, and I will not assist any other person or

7    organization in competing with the Company or in preparing to engage in competition with the

8    business or proposed business of the Company." *Id.* § 5.

9        As set forth in the PIIA and the Employee Handbook, Riya is the sole owner of the

10   Proprietary Information and Confidential Materials, and has no rights in the either.  Shah Decl.

11   ¶ 7, Ex. A.  Moreover, both the PIIA and the Employee Handbook require that when terminated,

12   Kirsch must return to Riya all Proprietary Information and Confidential Materials that were in her

13   possession. *Id.* ¶ 22, Ex. C.  Before filing suit, Riya contacted Kirsch by telephone, email and

14   letter from counsel, all of which efforts were met with silence. *Id.* ¶ 20.  Kirsch did not respond

15   to Riya's requests that she provide an accounting of Riya's confidential and proprietary business

16   and trade secret information that she had. *Id.*  Instead, on the day that Riya's counsel had

17   requested that Kirsch provide the assurances and accounting regarding the confidential

18   information, Kirsch's counsel sent a letter that stated that Kirsch had retained him and that he

19   would get back to Riya next week -- but counsel did not provide any assurance that the relevant

20   evidence would be preserved or provide the requested accounting.  Romley Decl. ¶ 3, Ex. A.

21   Because Riya's Proprietary Information and Company Materials belong to Riya and Kirsch has

22   no legitimate interest in or right to that property, her refusal to provide an accounting of the

23   information or to return it constitutes a breach of the PIIA. *See, e.g., Erich v. Granoff,* 109 Cal.

24   App. 3d 920, 930 (1980) ("The unjustified failure of an obligor to perform a contract constitutes a

25   breach of that contract." (citing Restatement of Contracts § 312 and 1 Witkin, *Summary of Calif.*

26   *Law* § 616, p. 525 (8th ed. 1973))).

27

28

- 16 -

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1    **B.    Riya Will Suffer Irreparable Harm If Interim Relief Is Not Granted.**

2    Courts routinely recognize that the loss of a trade secret to a competitor or potential

3    competitor is an irreparable injury that cannot be remedied solely in damages. *See, e.g., Apple*

4    *Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 525-26 (9th Cir. 1984) (irreparable harm

5    found where plaintiff presented evidence of "considerable time and money that it had invested in

6    the development of [its]computer programs"); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49

7    (2d Cir. 1999) ("loss of trade secrets cannot be measured in money damages because [a] trade

8    secret once lost is, of course, lost forever" (citations and internal quotation marks omitted)). As

9    one court stated,

10    Irreparable injury is . . . shown by the evidence of [plaintiff's]
   investment of time and money in the development of the secret
11    processes misappropriated by defendants . . . since harm to
   [plaintiff's] competitive position lacks any adequate remedy at law.
12

13    *Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 231 (S.D. Cal. 1986) (citing *Apple Computer*, 725

14    F.2d at 525-26). Accordingly, courts regularly find that improper exploitation of another's trade

15    secrets conduct causes irreparable injury and "is an appropriate subject for a preliminary

16    injunction." *See id.* (citing *K-2 Ski Co.*, 506 F.2d at 471).

17    Similarly, courts have found irreparable injury, and granted injunctions, based on the

18    misuse of confidential, proprietary information even if it does not qualify as a trade secret. *See,*

19    *e.g., United States Golf Ass'n v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 623 (1999)

20    (common law misappropriation claim); *Courtesy Temporary Serv., Inc. v. Camacho*, 222 Cal.

21    App. 3d 1278, 1291 (1990) (unfair competition claim). Moreover, intangible injuries, such as

22    loss of customers and future sales as well as damage to a business's goodwill, can support a

23    finding of irreparable injury. *See Nike, Inc.*, 379 F.3d at 587 ("Nike has shown potential harm

24    from unfair competition due to McCarthy's knowledge of confidential information peculiar to

25    Nike's products"); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841

26    (9th Cir. 2001) (finding irreparable injury in trademark infringement case where plaintiff

27    threatened with loss of prospective customers or goodwill).

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1    Indeed, Kirsch agreed that if she violated the agreement, the company would be entitled to

2    obtain injunctive relief against her, *without necessity of a bond*:

> 3    Because my services are personal and unique and because I may
>      have access to and become acquainted with the Proprietary
> 4    Information of the Company, the Company *shall have the right to
>      enforce this Agreement and any of its provisions by injunction,*
> 5    specific performance or other equitable relief, *without bond,*
>      without prejudice to any other rights and remedies that the
> 6    Company may have for a breach of this Agreement.

7    Shah Decl., Ex. A ¶13 (emphasis added).

8    The irreparable harm to Riya if Kirsch is not enjoined from further disclosing or using its

9    confidential and proprietary business and trade secrets is apparent.  In short, this is a textbook

10    example of the propriety of provisional relief:  the injunction sought by Riya is modest in its

11    effects on Kirsch (none), but without it, Riya is likely to be unable to vindicate its rights even if it

12    ultimately prevails in the dispute.

13    **C.    An Order To Kirsch Not To Use Or Disclose Riya's Confidential and
         Proprietary Business and Trade Secrets Is Necessary To Preserve The Status
14       Quo And Protect Riya's Trade Secrets.**

15    There can be no question that Kirsch has already misappropriated Riya's trade secrets.

16    Kirsch misappropriated Riya's trade secrets simply by acquiring them and disclosing them to a

17    competitor.  Having completed these two forms of misappropriation, provisional injunctive relief

18    is absolutely essential to prevent the third and most damaging form of misappropriation:  use of

19    the trade secrets.  "Employing the confidential information in manufacturing, production,

20    research or development, marketing goods that embody the trade secret, or soliciting customers

21    through the use of trade secret information, all constitute use."  *PMC, Inc. v. Kadisha*, 78 Cal.

22    App. 4th 1368, 1383 (2000).

23    It strains credulity to believe that Kirsch went to the extraordinary length of

24    misappropriating Riya's confidential and proprietary business and trade secret information,

25    including the software that she admitted stealing, only to store it on her home computer.  Rather,

26    it is clear that Kirsch has misappropriated this information in order to use it for her and/or Lewis's

27    gain -- as evidenced by her promise to Lewis that after she left the company she would "bat

28    around what I learned at Riya *for you.*"  Romley Decl., Ex. G (emphasis added).  Under these

- 18 -

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1   circumstances, no further proof of misappropriation is necessary for injunctive relief. To the

2   contrary, "[a]ctual or threatened misappropriation may be enjoined." Cal. Civ. Code § 3426.2(a).

3   In light of Defendants' completed misappropriations, an injunction against further (and even more

4   damaging) misappropriations is well warranted.

5       By contrast, there is absolutely no harm to Kirsch of an order precluding her from using or

6   further disclosing confidential information that she has taken from Riya. Indeed, it is difficult

7   even to conceptualize any injury that this might cause her, in light of her gross misconduct and

8   contractual obligation to not use or disclose Riya's confidential information. To the contrary,

9   "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact

10  that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson &*

11  *Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002); *see also Pappan*

12  *Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998) ("The self-inflicted

13  nature of any harm suffered by [the party opposing the injunction] also weighs in favor of

14  granting preliminary injunctive relief."). Because Kirsch would be enjoined only from using,

15  disclosing, destroying, or transferring Riya's confidential and proprietary business and trade

16  secret material that she stole from Riya, and to which she had no right in the first place to retain,

17  an injunction *will not* cause her *any* harm.

18  **D.    An Order To Preserve Evidence Is Necessary To Preserve The Status Quo
            And Protect Riya's Trade Secrets.**

19

20      The need for an order to preserve electronic evidence when data is stolen from a plaintiff

21  recently was discussed by a California court in *Dodge, Warren & Peters Ins. Servs., Inc. v. Riley*,

22  105 Cal. App. 4th 1414 (2003). There, the defendants were former employees of the plaintiff

23  who "agreed that they would obtain copies of documents maintained in [plaintiff's] files and

24  computer storage media" before leaving plaintiff's employment to start a competing business. *Id.*

25  at 1417. The trial court entered a preliminary injunction "require[ing] the preservation of

26  electronic evidence by prohibiting Defendants from destroying, deleting or secreting from

27  discovery any of their electronic storage media and by requiring them to allow a court-appointed

28  expert to copy all of it, including computer hard drives and discs, to recover lost or deleted files

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 19 -

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1    and to perform automated searches of that evidence." *Id.*   The Court of Appeal affirmed.  It

2    found that the plaintiff demonstrated a likelihood of prevailing on the merits, noting that "[t]his

3    point concerns whether there is evidence in the computer and other electronic storage media that

4    [plaintiff] will be able discover." *Id.* at 1420-21.  "On the issue of irreparable harm, the record

5    indicates that [plaintiff] could irretrievably lose evidence that otherwise would have been

6    available to it. . . .On the other hand, the record shows that the harm to Defendants would be

7    negligible." *Id.* at 1421.  In short, the court concluded:  "We cannot conceive, as a matter of

8    policy, given the broad discretion possessed of the trial court to ensure the effective

9    administration of justice, why injunctive relief should not be available under circumstances such

10    as these." *Id.* at 1418-19; *see also Northpoint Homeowners Ass'n v. Super. Ct.*, 95 Cal. App. 3d

11    241, 244 (1979) ("[T]rial courts have inherent power to preserve and compel the furnishing of

12    evidence in a pending civil action." (citing *Union Oil Co. v. Reconstruction Oil Co.*, 4 Cal. 2d 541

13    (1935))).

14        Similarly here, there is no question that the evidence Riya requests this Court order Kirsch

15    to preserve is discoverable.  "The Advisory Committee Notes to Fed. R. Civ. P. 34 referenced

16    above makes it clear that information stored in computer format is discoverable." *Playboy*

17    *Enters, Inc. v. Welles*, 60 F. Supp. 2d 1050, 1053 (S.D. Cal. 1999), *aff'd in part and rev'd in part*

18    *on other grounds*, 279 F.3d 796 (9th Cir. 2002).  Furthermore, Riya has made a strong showing

19    that this discoverable information will not only be relevant, but damning of Kirsch.  This

20    evidence is likely to include one or more of the following:  (1) Riya's proprietary and trade secret

21    software, including its unique algorithms that are at the core its technology; (2) Riya's customer

22    information, including names, addresses, telephone numbers and contact persons; (3) the details

23    of deals that Riya has structured with it's customers; (4) the marketing plans and strategies of

24    Riya; and (5) Riya's business plans and financial data.  Given the lengths to which Kirsch has

25    gone to obtain this information and the enormous monetary value it represents to Riya, evidence

26    of Kirsch's theft of confidential and proprietary business and trade secret information is almost

27    certain to be found if an appropriate preservation order is entered before Kirsch has an

28    opportunity to destroy or secrete the evidence away.

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 20 -

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

1       Likewise, Riya has made a showing of even greater potential irreparable harm than in

2   *Dodge*. There, the plaintiff and the court primarily were concerned with the potential destruction

3   of evidence that would prevent the plaintiff from proving its case. That concern is equally

4   applicable here. More importantly, however, there is an imminent threat in this case that Kirsch

5   will not merely destroy evidence, but transfer it to a direct competitor as she promised to do.

6   Riya will suffer irreparable injury if Kirsch is not ordered to preserve, and not to destroy, delete,

7   secret, or transfer, this electronic evidence. *Cf. Religious Tech. Ctr. v. Netcom On-Line*

8   *Commc'ns Servs., Inc.*, 923 F. Supp. 1231, 1256 (N.D. Cal. 1995) ("The court is troubled by the

9   notion that any Internet user . . . can destroy valuable intellectual property rights by posting them

10  over the internet."). By contrast, in light of Kirsch's complete lack of rights in the trade secret

11  information she has stolen from Riya, the order cannot harm any of her legitimate interests. In

12  these circumstances, a preservation order is appropriate.

13      **E.    An Order Requiring Kirsch To Return All Of Riya's Confidential and**
            **Proprietary Business and Trade Secret Information Is Necessary To Preserve**
14          **The Status Quo And Protect Riya's Trade Secrets.**

15      Kirsch, and all persons and/or entities acting on her behalf, for her benefit or in active

16  concert or participation with her, must return immediately all of Riya's confidential and

17  proprietary business and trade secret information in her possession, custody and/or control. Until

18  that information is returned, in its original format and as is incorporated into other documents

19  and/or electronic data, Riya remains at significant risk of harm. Each person and/or entity

20  returning material must also provide an accompanying sworn statement that declares that: (1) he,

21  she or it has returned all of the Riya confidential and proprietary business and trade secret

22  information that had been in his, her or its possession, custody and/or control; (2) identifies all

23  persons and/or entities, including name, address and telephone number and if applicable,

24  employer; (3) the exact information disclosed to each such person and/or entity; and (4) the date

25  of each disclosure.

26  **IV.    CONCLUSION**

27      For all of the foregoing reasons, Riya requests that the Court grant its *ex parte* application

28  for a Temporary Restraining Order and (1) enjoin Kirsch and all persons acting in concert with

- 21 -

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1  her, from using, copying, publishing, disclosing, transferring, or selling Riya's confidential and

2  proprietary business and trade secret information, or any product or services based on or

3  incorporating all or part of that information, and restraining her from obtaining any commercial

4  advantage or unjust enrichment from the misappropriation of Riya's confidential and proprietary

5  business and trade secret information; (2) enjoin Kirsch from further breaching the PIIA;

6  (3) order Kirsch to show cause why she should not be similarly enjoined pending resolution of

7  this dispute on the merits; and (4) enter a preservation order to maintain the status quo.

8      Dated: January 24, 2008                    Respectfully Submitted,

9                                                 ERIC J. AMDURSKY
                                                   LORI E. ROMLEY
10                                                 JUSTIN D. WALKER
                                                   O'MELVENY & MYERS LLP
11

12                                                 By: _Lori E. Romley_____

13                                                 Lori E. Romley
                                                   Attorneys for Plaintiff
14                                                 RIYA, INC.

MP1:1012799.4

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK