ERIC J. AMDURSKY (S.B. #180288)
LORI E. ROMLEY (S.B. #148447)
JUSTIN D. WALKER (S.B. #252268)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94025
Telephone: (650) 473-2600
Fax: (650) 473-2601
Email: eamdursky@omm.com
       lromley@omm.com
       jwalker@omm.com

Attorneys for Plaintiff
RIYA, INC.

ORIGINAL
FILED

JAN 2 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

MMC

|  |  |
|---|---|
| RIYA, INC., a California Corporation<br><br>Plaintiff,<br><br>v.<br><br>DEBORAH BETH KIRSCH,<br><br>Defendant. | Case No. _____ 08 0547<br><br>**DECLARATION OF LORI E. ROMLEY IN SUPPORT OF PLAINTIFF RIYA, INC.'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

# DECLARATION OF LORI E. ROMLEY

I, Lori E. Romley, declare as follows:

1.    I have personal knowledge of the matters recited herein and, if called to do so, could and would competently testify thereto.

2.    I am a counsel at the law firm of O'Melveny & Myers LLP, and an attorney licensed to practice before all courts of the State of California and the United States District Court for the Northern District of California. I am an attorney of record for plaintiff Riya, Inc. ("Riya") and I provide this declaration in support of Riya's Ex Parte Application for a Temporary Restraining Order.

3.    Riya's Ex Parte Application for a Temporary Restraining Order is brought in connection with its Complaint. A true and correct copy of the Complaint is attached hereto as **Exhibit A**.

4.    I reviewed many of the electronic records stored on the hard drive of the company-issued laptop computer used by Kirsch during her employment with Riya (the "Computer"). During that review, I discovered on the Computer that she had a file that contained approximately 192 emails containing Riya's daily financial reports.

5.    I also located on the Computer what appeared to be thousands of instant messages ("IM"), and attach hereto true and correct copies of certain of those IMs that were printed from the Computer, hereto as the following exhibits:

| | |
|---|---|
| **EXHIBIT B:** | An IM dated December 15, 2007, in which Kirsch stated, "I still can't believe I'm leaving . . . I can't believe I screwed up so much . . . ." |
| **EXHIBIT C:** | In IM dated December 15, 2007, in which Kirsch expressed concern about her exit from Riya, and that she felt that she had let down "M" (a reference to Munjal Shah, the CEO and Co-Founder of Riya). |
| **EXHIBIT D:** | In IM dated December 16, 2007, in which Kirsch advised David Lewis, the President and Founder of 77blue.com, which operates the shopping portals cashbaq.com and anycoupons.com, which compete with Riya, that his company should build a search engine similar to what Riya had built and she offers: "I'll tell you how." |
| **EXHIBIT E:** | In IM dated July 26, 2007, in which Kirsch disclosed Riya's confidential financial information. |

ROMLEY DECLARATION ISO OF
APPLICATION FOR TRO

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

| | | |
|---|---|---|
| 1 | **EXHIBIT F:** | In IM dated December 16, 2007, in which Kirsch offered to meet with Lewis in January 2008 to disclose Riya's company secrets: "what I learned at Riya." |
| 2 | | |
| 3 | **EXHIBIT G:** | In IM dated December 16, 2007, in which Kirsch promises Lewis that after she left the company she would "bat around what I learned at Riya for you." |
| 4 | | |
| 5 | **EXHIBIT H:** | In IM dated December 20, 2007, in which Kirsch admits to stealing software from Riya. |
| 6 | | |

6.     I also reviewed Kirsch's "Saved Attachments" file on the Computer and found a file called "Beth's Contacts," which contained contact information for many Riya's merchant customers, including the name, phone number and Riya's contact person for those merchants.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of January 2008, at Menlo Park, California.

Lori E. Romley

MP1:1012702.2

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

ROMLEY DECLARATION ISO OF
APPLICATION FOR TRO

# EXHIBIT A

ERIC J. AMDURSKY (S.B. #180288)
LORI E. ROMLEY (S.B. #148447)
JUSTIN D. WALKER (S.B. #252268)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94025
Telephone: (650) 473-2600
Fax: (650) 473-2601
Email: eamdursky@omm.com
        lromley@omm.com
        jwalker@omm.com

Attorneys for Plaintiff
RIYA, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| RIYA, INC., a California Corporation<br><br>Plaintiff,<br><br>v.<br><br>DEBORAH BETH KIRSCH,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) MISAPPROPRIATION OF TRADE SECRETS;**<br><br>**(2) CLAIM AND DELIVERY;**<br><br>**(3) VIOLATION OF COMPUTER FRAUD & ABUSE ACT;**<br><br>**(4) STATUTORY UNFAIR COMPETITION;**<br><br>**(5) CONVERSION;**<br><br>**(6) BREACH OF CONTRACT AND DECLARATORY RELIEF;**<br><br>**(7) BREACH OF FIDUCIARY DUTY / DUTY OF LOYALTY; AND**<br><br>**(8) MONEY HAD AND RECEIVED** |

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

COMPLAINT

1    Plaintiff Riya, Inc., by and through its undersigned counsel, hereby alleges as follows:

2    **PRELIMINARY STATEMENT**

3    1.    Riya, Inc. ("Riya") provides a highly specialized and very powerful search engine

4    for visual shopping through its flagship product, Like.com.  Unlike typical shopping search

5    engines, Riya allows consumers to search products visually, through the use of object recognition

6    technology.  Once consumers see a picture of a product that they like, they can click on the

7    picture and Riya's search engine finds visually similar items based upon shape, color, and pattern.

8    Once the consumer clicks on an image that he wants to purchase, he is sent to the contracting

9    merchant's website to purchase the product (the click through).  The merchants pay Riya on a per

10    click through basis.  Because Riya's source code contains unique algorithms, it permits the

11    consumer to quickly click through to the merchant's site, which generates more money for Riya.

12    To Riya's knowledge, no other company has this type of algorithm and all other online shopping

13    sites are significantly slower than Riya's search engine.

14    2.    Defendant Deborah Beth Kirsch ("Kirsch") was employed for just over one year,

15    ultimately holding the high level position of Riya's Vice President of Marketing and Sales.  She

16    was on the executive staff and attended meetings of the board of directors.  As a result, she

17    received highly confidential materials in board packages, and Kirsch had access to the daily

18    financial reports that Riya generated.  Moreover, in her position, Kirsch worked with Riya's core

19    trade secrets in developing Riya's marketing and distribution plans and strategies, and she

20    assisted the engineering staff with work on the core search engine trade secrets.  She had

21    complete access to the core algorithms that allow Riya to maintain its place in the market and

22    give it a distinct competitive edge.  Without these algorithms, no other company has been able to

23    match Riya's success in this field.  In short, Kirsch had free access to the company's most closely

24    guarded confidential and trade secret information.

25    3.    In December, 2007, Riya discovered that Kirsch had violated her duties to keep

26    Riya's confidential and proprietary business and trade secret information confidential.  In willful

27    disregard of her obligations, Kirsch inappropriately disclosed highly confidential information to a

28    non-managerial employee.  As a result, on or about December 11, 2007, Riya told Kirsch that she

- 2 -

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1    was being terminated for breaching her duties of confidentiality and that her last day would be

2    December 31, 2007. Kirsch never denied the accuracy of Riya's allegations, nor could she, and

3    in her later instant messages, she admitted that she had "screwed up" and felt like she had let the

4    company down.

5         4.    After Kirsch left Riya, on January 11, 2008, Riya opened Kirsch's company laptop

6    computer to locate an Insertion Order submitted by a customer merchant, and discovered that

7    Kirsch, who had been a trusted executive, had been stealing the company's confidential and

8    proprietary business and trade secret information, for the benefit of direct competitors,

9    cashbaq.com and/or anycoupons.com. In one instant message ("IM"), which is essentially a real

10   time email message, Kirsch advised David Lewis, the President and Founder of 77blue.com,

11   LLC, which operates shopping portals including cashbaq.com and anycoupons.com, that his

12   company should build a search engine similar to what Riya had built -- and offers generously to

13   give away Riya's most deeply guarded secrets: "I'll tell you how."

14        5.    In other IMs written while she was still employed by Riya, Kirsch disclosed Riya's

15   confidential deal and financial information. These actions violate the company's Proprietary

16   Information and Inventions Assignment Agreement ("PIIA"), which Kirsch signed on

17   September 14, 2006, and/or California law. A true and correct copy of the PIIA is attached as

18   **Exhibit A** and incorporated herein by reference.

19        6.    On December 20, 2007 -- after she had learned the severe consequence for

20   breaching her duties of confidentiality -- she nonetheless offered to meet with Lewis in January

21   2008 to disclose Riya's company secrets: "all that I learned at Riya."

22        7.    Riya brings this suit against Kirsch for (1) Misappropriation Of Trade Secrets;

23   (2) Claim And Delivery; (3) Violation Of Computer Fraud & Abuse Act; (4) Statutory Unfair

24   Competition; (5) Conversion; (6) Breach Of Contract And Declaratory Relief; (7) Breach Of

25   Fiduciary Duty/Duty Of Loyalty, and (8) Money Had and Received, and is seeking a temporary

26   restraining order and preliminary and permanent injunctions so that it can avoid further injury in

27   the marketplace.

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 3 -                                    COMPLAINT

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1

## THE PARTIES

2       8.      Riya is a corporation organized and existing under the laws of California with its

3   headquarters in San Mateo, California, and has as its subsidiary, Like.com.  Riya maintains its

4   principal place of business at 3 Waters Park Drive, Suite 120, San Mateo, California.  Kirsch

5   worked out of this office during the time she was employed by Riya.  Riya is the first true visual

6   search engine, where the contents of photos are used to search and retrieve similar items.

7       9.      Deborah Beth Kirsch is an individual who was hired by Riya on September 13,

8   2006.  Kirsch was originally hired as Riya's Director of Marketing, but later held the position of

9   Vice President of Marketing and Sales.  Kirsch was terminated from Riya as of December 31,

10  2007.  Riya is informed and believes, and on that basis alleges, that Kirsch is an individual who

11  resides in the City and County of San Francisco, State of California.

12      10.     Kirsch is subject to jurisdiction in this Court.

13

## JURISDICTION AND VENUE

14      11.     This Court has subject matter jurisdiction over Riya's claims under the Computer

15  Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, and under 28 U.S.C. § 1331 and 28 U.S.C.

16  § 2201.  Supplemental jurisdiction is appropriate over Riya's state law claims pursuant to

17  28 U.S.C. § 1367.

18      12.     Venue is proper in this Court under 28 U.S.C. Section 1391(b) because a

19  substantial part of the events that gave rise to Riya's claims took place within the District,

20  Kirsch's tortious conduct was directed at this District, and because Riya was injured by Kirsch's

21  tortious conduct committed in this District.

22

## GENERAL ALLEGATIONS

23

### Riya's Business and Kirsch's Employment

24      13.     Riya is a small privately-held company that was founded August 6, 2004.  Riya

25  currently has 23 employees in the United States, along with two employees in India.  Riya's

26  prized website, Like.com, offers customers the opportunity to shop through a visual search

27  engine.  Like.com is the first true visual search engine on the market today.  Shoppers are able to

28  log onto Like.com and click on pictures of products that they like.  The search engine uses Riya's

- 4 -                                        COMPLAINT

1    proprietary Likeness Technology™ (which searches by image instead of text), Like Detail™

2    (which searches by specific features, such as a buckle, heel or watch bezel) and Like Color™

3    (which searches by color variants in the items chosen by the customer) to search for other items

4    that are similar, which the consumer might want to purchase.  That specialized and unique

5    technology creates a digital signature that describes the photo's contents and enables a more

6    accurate search for similar looking items and products.  Riya generates revenue through Like.com

7    by sending leads to the merchants who sign up with the site.  Once a consumer clicks on a

8    product to purchase, Riya's powerful search engine clicks the consumer through to the

9    contracting merchant's website.

10         14.    Riya's product has been immensely successful.  Riya attributes this success to its

11    source code that contains unique and proprietary algorithms.  Riya is informed and believes, and

12    on that basis alleges, that Like.com is currently the only search engine that has those algorithms,

13    which permit Like.com consumers to quickly and reliably click through to the contracting

14    merchant's website.

15         15.    In September 2006, Riya hired Kirsch as its Director of Marketing and she later

16    held the title of Vice President of Marketing and Sales.  She was a member of Riya's Executive

17    Staff and regularly attended the company's board of director meetings.  Prior to those meetings,

18    Kirsch received board packages, which contained highly confidential and proprietary business

19    information.  Kirsch also received daily financial reports generated by the company.  Indeed,

20    Kirsch had a separate email file on her company laptop computer for these daily reports and had

21    at least 192 reports archived.  Kirsch was also deeply involved with Riya's core trade secrets with

22    respect to marketing and distribution.  Further, Kirsch spent a great deal of time assisting the

23    engineering staff while they worked on the core trade secrets of the search engine, including the

24    proprietary algorithms.  In her executive position, Kirsch was privy to Riya's confidential,

25    proprietary and trade secret information and had access to virtually all of Riya's carefully guarded

26    information and trade secrets.

27         16.    Riya has implemented numerous precautions to protect its trade secrets.  As part of

28    these efforts, Riya requires each of its employees to sign the Company's Proprietary Information

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1   and Inventions Assignment Agreement.  Consistent with these efforts, Riya and Kirsch entered

2   into the PIIA on September 14, 2004.  Ex. A.  The PIIA states that it is "a material part of the

3   consideration" for Kirsch's employment or continued employment and that it is effective as of her

4   first date of employment.  Ex. A at p. 1.  The PIIA contains the following provisions that are

5   relevant to this action:

6           "Proprietary Information" includes, without limitation, information
            (whether conveyed orally or in writing) about algorithms,
7           application programming interfaces, protocols, trade secrets,
            computer software, designs, technology, ideas, know-how,
8           products, services, processes, data, techniques, improvements,
            inventions (whether patentable or not), works of authorship,
9           business and product development plans, the salaries and terms of
            compensation of other employees, customer lists and other
10          information concerning the Company's actual or anticipated
            business, research or development, or that is received in confidence
11          by or for the Company from any other person.  I understand that my
            employment creates a relationship of confidence and trust between
12          me and the Company with respect to Proprietary Information.

13   Ex. A, § 1.

14          "Company Materials" are documents or other media or tangible
            items that contain or embody Proprietary Information or any other
15          information concerning the business, operations or plans of the
            Company, whether such documents have been prepared by me or
16          by others. . . . [and] include[s], without limitation, blueprints,
            drawings, photographs, charts, graphs, notebooks, customer lists,
17          computer software, media or printouts, sound recordings and other
            printed, typewritten or handwritten documents, as well as sample,
18          prototypes, models, products and the like.

19   Ex. A § 2.

20          At all times, both during my employment with the Company and
            after its termination, I will keep in confidence and trust and will not
21          use or disclose any Proprietary Information or anything relating to
            it without the prior written consent of an officer of the Company
22          except as may be necessary and appropriate in the ordinary course
            of performing my duties to the Company.
23

24   Ex. A § 3.1.

25          All Company Materials shall be the sole property of the Company.
            I agree that during my employment with the Company, I will not
26          remove any Company Materials from the business premises of the
            Company or deliver any Company Materials to any person or entity
27          outside the Company, except as I am required to do in connection
            with performing the duties of my employment.  I further agree that,
28          immediately upon the termination of employment by me or the

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 6 -

COMPLAINT

1    Company for any reason, or for no reason, or during my
     employment if so requested by the Company, I will return all
2    Company Materials, apparatus, equipment and other physical
     property, or any reproductions of such property, excepting only (i)
3    my personal copies of records relating to my compensation; (ii) my
     personal copies of any materials previously distributed generally to
4    stockholders of the Company; and (iii) my copy of this Agreement.

5    Ex. A § 3.2.

6    Non-Competition. I agree that during my employment with the
     Company, I will not engage in any employment, business, or
7    activity that is in any way competitive with the business or
     proposed business of the Company, and I will not assist any other
8    person or organization in competing with the Company or in
     preparing to engage in competition with the business or proposed
9    business of the Company. The provisions of this paragraph shall
     apply both during normal working hours and at all other times
10   including, without limitation, nights, weekends and vacation time,
     while I am employed with the Company.
11

12   Ex. A § 5.

13   I agree that my obligations under Sections 3.1 through 3.8, Section
     4 and Section 9 of this Agreement shall continue in effect after
14   termination of my employment, regardless of the reason or reasons
     for termination, and whether such termination is voluntary or
15   involuntary on my part, and that the Company is entitled to
     communicate my obligations under this Agreement to any future
16   employer or potential employer of mine.

17   Ex. A § 10.

18   Because my services are personal and unique and because I may
     have access to and become acquainted with the Proprietary
19   Information of the Company, the Company shall have the right to
     enforce this Agreement and any of its provisions by injunction,
20   specific performance or other equitable relief, without bond,
     without prejudice to any other rights and remedies that the
21   Company may have for a breach of this Agreement.

22   Ex. A § 13.

23   I HAVE READ THIS AGREEMENT CAREFULLY AND I
     UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT
24   IMPOSES UPON ME WITHOUT RESERVATION. NO
     PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO
25   ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN
     THIS AGREEMENT VOLUNTARILY AND FREELY, IN
26   DUPLICATE, WITH THE UNDERSTANDING THAT ONE
     COUNTERPART WILL BE RETAINED BY THE COMPANY
27   AND THE OTHER COUNTERPART WILL BE RETAINED BY
     ME.
28   Ex. A at p. 5.

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

COMPLAINT

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

17. Kirsch was given an Employee Handbook when she started her employment with Riya. The Employee Handbook sets forth Riya's ethical standards, including "[t]o protect confidential information," and it explains that misconduct includes, "[d]amaging, destroying, removing without authority, or failing to return, any property (physical or intellectual) belonging to the company . . . ." True and correct copies of the passages cited from the Employee Handbook are attached hereto as **Exhibit B**.

18. The Employee Handbook also states:

> As an employee, you may learn information about the company that is not known by the general public. This information may include trade secrets, business plans, financial results, marketing and sales plans, or acquisition or disposition of company assets. Regardless of whether this type of information is specifically classified as confidential, it is each employee's responsibility to keep this information in confidence. All items such as manuals, reports, records and statements, other than those made available to the general public, are the property of the company, generally to be kept at the company's place of business and are to be returned to the company when requested and upon termination.

19. Riya employees are expressly forbidden in the Employee Handbook from: "Using information developed or learned on the job for personal or familial benefit. This includes the use of company databases, financial information, and intellectual property" and from "Sharing confidential or proprietary company related information with business associates or representatives of other companies."

20. Riya's Employee Handbook further states that:

> To jeopardize the security of restricted information is detrimental to company and employee security. We need all employees to do their part in protecting such information by not disclosing any trade secrets or confidential information or using it in any manner that is unauthorized or detrimental to the best interests of the company. Some employees who have access to confidential, sensitive, or proprietary information about the company or its clients, processes, and employees may also need to sign a Proprietary Information and Inventions Agreement (PIIA) as a condition of employment. Employees who disclose trade secrets or confidential company information may be subject to disciplinary action, up to and including discharge.

21. Riya's employees are also told in the Employee Handbook that: "All business equipment, electronic and telephone communications systems, and all communications and

COMPLAINT

1    stored information transmitted, received, or contained in the company's information systems are

2    the company's property and are to be used for job-related purposes unless otherwise authorized

3    by the company."

4        22.    Finally, the Employee Handbook demands that: "If you leave our employ, you will

5    need to return any company property in your possession."

6                          **Kirsch's Termination**

7        23.    In early December 2007, Riya learned that Kirsch had breached her duties of

8    confidentiality by disclosing confidential management materials to a non-managerial employee.

9    Riya told Kirsch that she was being terminated for this breach of confidentiality and for non-

10   performance, and Kirsch did not deny the breach accusation.  She knew it was true.  Indeed, in

11   one IM that she sent to Lewis just after she was informed of her termination, she wrote, "I still

12   can't believe I'm leaving . . . I can't believe I screwed up so much . . ."  A true and correct copy

13   of this December 15, 2007 IM is attached hereto as **Exhibit C** and incorporated herein by

14   reference.  In another IM written that same day, Kirsch explained that she was worried about the

15   exit from Riya and she felt that she had let down "M" (a reference to Munjal Shah, the CEO and

16   Co-Founder of Riya).  A true and correct copy of this December 15, 2007 IM is attached hereto as

17   **Exhibit D** and incorporated herein by reference.

18       24.    Riya allowed Kirsch to remain employed by the company until December 31,

19   2007, but her last actual day in the Riya office was December 21.  When she departed, she left her

20   company laptop computer at Riya.  Kirsch's computer was locked up in the employee vault from

21   the day she left until January 11, 2008, the day the company discovered Kirsch had stolen and

22   disclosed Riya's confidential and proprietary business and trade secret information.

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

COMPLAINT

**Kirsch's Willful Misappropriation of Riya's Confidential and
Proprietary Business and Trade Secret Information**

25.     Kirsch has a practice of disclosing Riya's confidential and proprietary business and trade secret information.  She repeatedly volunteered to give others Riya's information to which they had no right, and freely shared details of Riya's deals and financial information.

26.     On July 26, 2007, Kirsch disclosed Riya's confidential and proprietary financial information to Lewis, including the "run rate" for Riya.

27.     Kirsch shared confidential deal information with Lewis, in an IM dated November 26, 2007.  Kirsch disclosed to Lewis the details of the deal that Riya was negotiating with a Partner.  Kirsch revealed to Lewis the name of the Partner, the percentages of revenue sharing that were being discussed between Riya and the Partner, and the other terms that Riya was seeking to include in the deal.  The "percentages" refer to the amount of revenue shared between the Partner and Riya.

28.     Kirsch also violated Riya's confidentiality by, among other things, sending at least one board of director package, which is meant for management's eyes only, to a subordinate (Osborn), who in the ordinary course would have no right of access to that information.  In an IM dated December 3, 2007, Kirsch wrote:

| | |
|---|---|
| Kirsch: | you want the BoD pack |
| Osborn: | Who? |
| Kirsch: | look at the linkedin |
| Kirsch: | a brander |
| Kirsch: | sam |
| Kirsch: | now that is what we need |
| Kirsch: | sending you the BoD pack |
| Kirsch: | needs to stay between us |
| Osborn: | Yeah send it over |
| Kirsch: | I jjusut [sic] did |
| Kirsch: | accept it |

- 10 -

COMPLAINT

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

| | | |
|---|---|---|
| 1 | Osborn: | understood. Thx |
| 2 | . . . | |
| 3 | Osborn: | Can't receive it on this I'm [sic]. Send via email |
| 4 | Kirsch: | personal email |
| 5 | Osborn: | On my sidekick so Im is limited |
| 6 | Kirsch: | send from Y! |

A true and correct copy of this IM is attached hereto as **Exhibit E**, and incorporated herein by reference.

29.    Even though Kirsch was told on or about December 11, 2007 that she was being terminated for breaching her duties of confidentiality, she sent an IM just a few days later to Lewis, which reads as follows:

| | |
|---|---|
| Kirsch: | I think you should build what Riya built |
| Kirsch: | I'll tell you how |
| Lewis: | I'm trying to! |
| Kirsch: | Well |
| Lewis: | I need the product pages first |
| Kirsch: | You need three |
| Kirsch: | researchers |
| . . . | |
| Lewis: | Let's discuss it in January |
| Kirsch: | I thought it might be good to come visit you |
| Kirsch: | and just bat around what I learned at Riya |
| Kirsch: | for you |

A true and correct copy of this IM is attached hereto as **Exhibit F**, and incorporated herein by reference.

30.    It is clear from that IM that notwithstanding that Kirsch knew from her termination that she should not disclose Riya's confidential and proprietary business and trade secret

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 11 -

COMPLAINT

1    information, she fully intended to do so after the she left the company for the direct benefit of a

2    Riya competitor.

3         31.    In an IM dated December 20, 2007, her next to last day at Riya, Kirsch admits to

4    stealing Riya software:

|  |  |  |
|--|--|--|
| Lewis: | Just so you know, you are not allowed to say ANYTHING negative |
|  | about your next job for 12-18 months |
| Lewis: | PERIOD |
| Lewis: | No exceptions |
| Kirsch: | :) |
| Kirsch: | k |
| Kirsch | stealing software from Riya |

12   A true and correct copy of this IM is attached hereto as **Exhibit G**, and incorporated herein by

13   reference.

14        32.    On January 11, 2008, Riya discovered the above-referenced IMs on Kirsch's

15   company laptop computer and a myriad of others, that revealed extensive misappropriation and

16   disclosure of Proprietary Information (as defined in Paragraph 1 of the PIIA) and Company

17   Materials (as defined in Paragraph 2 of the PIIA) for the benefit of competitors.

18        33.    On January 15, 2008, Shah, concerned about Kirsch's disclosure and future

19   disclosure of Riya's confidential and proprietary business and trade secret information, called

20   Kirsch to discuss these issues, but she was unavailable. Shah left her a message, which was not

21   returned. Additionally, Shah sent Kirsch an explicit email advising her of what he found on her

22   laptop and told her that some of the IMs that he reviewed evidenced that she had misappropriated

23   Riya's Proprietary Information. Shah stated that in one IM, "you explicitly indicate that you are

24   stealing software from the company." Shah told Kirsch that he was shocked by what he had read

25   in her IMs and that he was extremely disappointed with the way in which she conducted herself at

26   Riya. Finally, Riya stated that "I have never seen such unethical and even criminal behavior from

27   an executive before." A true and correct copy of this email is attached hereto as **Exhibit H** and

28   incorporated herein by reference. Kirsch did not respond to this email.

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

COMPLAINT

34.    In that same January 15 email, Shah advised Kirsch that the company's attorneys would be sending her a letter, which would be followed by a lawsuit that would seek an injunction against her.  Shah recommended that Kirsch not delete any relevant IMs or emails.

35.    The following day, Riya's attorneys sent Kirsch a letter explaining that she had continuing obligations to Riya under her PIIA, and California and federal law.  This letter also explained to Kirsch that based on Riya's discovery of Kirsch's misappropriation of its Proprietary Information and Company Materials and her stated intent to disclose Proprietary Information and Company Materials following the termination of her employment with Riya, a lawsuit would be brought against her.  As a result, Riya advised Kirsch that she has a duty to preserve all documents (in any format) that are relevant to Riya's claims against her.

36.    Finally, in that letter, Riya asked that Kirsch provide "(a) a complete accounting of confidential and proprietary business and trade secret information that you removed from the Company in any manner or medium at any time and for any purpose, (b) a complete accounting of the confidential and proprietary business and trade secret information that you provided to any third party, (c) an assurance that you will take appropriate measures to preserve all relevant records, electronic and hard copy, including but not limited to your instant messages and email communications with David Lewis and Aimen Barma, (d) an assurance that you will cease any conduct that will compromise the Company's confidential and proprietary business and trade secret information, (e) an assurance that you will comply with all of your obligations to the Company, including but not limited to your obligations not to use or disclose the Company's confidential and proprietary business and trade secret information, as well as the above-referenced continuing obligations under the PIIA . . ."

37.    Kirsch failed to respond to the January 16, 2008 letter or to provide the requested assurances and accounting.  Kirsch's attorney sent a letter the day that Kirsch's response to Riya was due, stating vaguely that he would respond to the letter sometime next week.  However, Kirsch's attorney provided none of the requested assurances or an accounting.  A true and correct copy of the January 18, 2008 letter is attached hereto as **Exhibit I**, and incorporated herein by reference.  As of January 24, however, Riya has not received any further response.

- 13 -

COMPLAINT

1

2

**FIRST CLAIM FOR RELIEF**
**MISAPPROPRIATION OF TRADE SECRETS**
(California Civil Code § 3426 et seq.)

3       38.     Riya repeats and incorporates herein by reference each and every allegation set

4   forth in the paragraphs above, as though fully set forth herein.

5       39.     Due to the nature of Riya's business, Riya must protect the secrecy of its many

6   valuable trade secrets and other confidential and proprietary materials in its possession.  In

7   particular, Riya goes to great lengths to protect its electronic information and its computer

8   networks from unauthorized access and/or distribution, including the trade secret materials and

9   confidential communications on its computer networks and shared between its personnel.

10       40.     When hired, employees are required to sign the PIIA, in which the employee

11   agrees to keep confidential all of Riya's Proprietary Information and Company Materials, which

12   includes all of Riya's confidential and proprietary business and trade secret information.  Riya's

13   Proprietary Information and Company Materials are only disclosed outside of Riya when

14   necessary, and then only pursuant to strict non-disclosure agreements.  Employees are also

15   instructed in the Employee Handbook that they must keep Riya's confidential information

16   confidential and that they must not disclose such information to business associates or

17   representatives of other companies.

18       41.     Access to Riya's office in San Mateo is permitted only with a key code or key.

19   Cornerstone Properties, the company that owns the building and premises where Riya is located,

20   provides physical security for the office.

21       42.     Riya's electronic communications and data are protected from unauthorized third

22   party access (*i.e.*, hacking) by a firewall that prevents unauthorized inbound internet traffic from

23   reaching Riya's computer networks.

24       43.     Many of Riya's core trade secrets, including but not limited to the algorithms,

25   source code, and source code control are located in a secure data center.  To gain access to the

26   data center, an employee must have a swipe card, pass a biometric identification and then once

27   inside, have a special key to gain access to the area where certain trade secrets are kept.  Certain

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 14 -

1    of this information could be accessed by Kirsch, once she was behind the Riya firewall, through

2    emails and an online network database called Wiki.

3        44.    Through the PIIA as well as the Employee Handbook, all Riya employees are

4    expressly prohibited from removing Proprietary Information and Company Material from the

5    office.

6        45.    Riya's confidential and proprietary business and trade secret information comprise

7    documents and information that are not generally known to the public or to other persons who can

8    obtain economic value from its disclosure or use.

9        46.    As explained above, Riya's confidential and proprietary business and trade secret

10    information are the subject of reasonable efforts by Riya to maintain their secrecy, and they

11    derive independent economic value from not being generally known.

12        47.    All or a portion of the documents and information comprising Riya's confidential

13    and proprietary business and trade secret information constitute "trade secrets" under California

14    Civil Code section 3426.1.

15        48.    Kirsch misappropriated Riya's trade secrets through improper means.

16    Specifically, as alleged above, Riya is informed and believes that Kirsch employed improper

17    means to obtain knowledge of Riya's confidential and proprietary business and trade secret

18    information and subsequently used and/or disclosed this information without the express or

19    implied consent or knowledge of Riya.

20        49.    Because of the above-alleged acts and conduct of Kirsch, Riya has been damaged

21    and, if Kirsch is not enjoined, Riya will continue to suffer great and irreparable harm.  The

22    amount of this irreparable harm will be difficult to ascertain, leaving Riya without an adequate

23    remedy at law.  Indeed, disclosure of Riya's product may allow other businesses to gain a

24    competitive advantage that they would not otherwise be entitled to obtain, which will

25    detrimentally affect Riya's place in the market and its market share.  Critically, if another

26    company gains access to Riya's source code and algorithms, Riya will lose its status as the only

27    company to use these unique trade secrets.  If that happens, the value of the company will

28    decrease in an amount up to $10-$20 million, which means that if acquired, Riya will realize

- 15 -

COMPLAINT

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1    significantly less than it otherwise would have and will be unable to reap the rewards of its

2    efforts. Finally, disclosure of Riya's confidential and proprietary business and trade secret

3    information may force Riya out of the market.

4         50.    Riya is entitled to a temporary, preliminary and permanent injunction restraining

5    Kirsch and all persons acting in concert with her, from using, copying, publishing, disclosing,

6    transferring, or selling Riya's confidential and proprietary business and trade secret information,

7    or any product or services based on or incorporating all or part of that information, and restraining

8    her from obtaining any commercial advantage or unjust enrichment from the misappropriation of

9    Riya's confidential and proprietary business and trade secret information.

10         51.    Riya is further entitled to an order requiring Kirsch and all persons acting in

11    concert with her, to return to Riya any and all materials and documents containing Riya's

12    Proprietary Information.

13         52.    Riya is further entitled to recover from Kirsch for the actual damages sustained by

14    Riya as a result of Kirsch's wrongful acts described above. The amount of such damages cannot

15    be determined precisely at this time. Riya is further entitled to recover from Kirsch the gains,

16    profits, advantages, and unjust enrichment that she has obtained as a result of her wrongful acts as

17    described herein. Riya is at present unable to ascertain the full extent of these gains, profits,

18    advantages and unjust enrichment.

19         53.    Upon information and belief, Kirsch's acts of misappropriation were both willful

20    and malicious, and Riya is entitled to an award of statutory exemplary damages and attorneys fees

21    against Kirsch.

### SECOND CLAIM FOR RELIEF
### CLAIM AND DELIVERY

24         54.    Riya repeats and incorporates herein by reference each and every allegation set

25    forth in the paragraphs above, as though fully set forth herein.

26         55.    Kirsch wrongfully took possession of Riya's confidential and proprietary business

27    and trade secret information, as described above, without Riya's knowledge, consent, or

28    authorization.

- 16 -

COMPLAINT

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

56.    Kirsch continues to possess Riya's confidential and proprietary business and trade secret information, and has not returned it to Riya, despite Riya's request that she do so.

57.    Kirsch is required to return Riya's confidential and proprietary business and trade secret information to Riya, both by law and under the PIIA.

58.    As a result of Kirsch's wrongful possession of Riya's confidential and proprietary business and trade secret information, Riya has suffered, and continues to suffer, significant damage, in an amount to be proved at trial.

59.    Kirsch has failed to return all Proprietary Information (as defined in Paragraph 1 of the PIIA) and Company Materials (as defined in Paragraph 2 of the PIIA) that contain Riya's trade secrets, and she has threatened to use and disclose such Proprietary Information and Company Materials for the benefit of a competitor of Riya, all of which is in direct violation of the PIIA, and the Employee Handbook.  Unless restrained and enjoined from engaging in these violations of her contractual and legal obligations to return to Riya all such Proprietary Information and Company Materials, Riya will suffer immediate and irreparable harm.  Riya cannot ascertain the amount of compensatory damages that could afford Riya adequate relief for Kirsch's continuing unlawful acts.  Riya's remedy at law is, therefore, inadequate to compensate for the injuries suffered or threatened.  Accordingly, Riya is entitled to specific performance requiring Kirsch and all persons acting in concert with her, to return all such Proprietary Information and Company Materials to Riya.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF COMPUTER FRAUD & ABUSE ACT
#### (18 U.S.C. § 1030)

60.    Riya alleges again each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

61.    Riya maintains its confidential and proprietary business and trade secret information on an email network and computer system that each meets the definition of a "protected computer" contained in 18 U.S.C. § 1030(e)(2)(B).

62.    Kirsch also maintained Riya's confidential and proprietary business and trade secret information on the hard disk drive of the company-owned laptop computer that Riya

COMPLAINT

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1  provided to Kirsch during her employment at Riya.  This laptop computer also constitutes a

2  "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2)(B).  All Riya employees are

3  instructed, at a minimum through the PIIA and the Employee Handbook, that the computers,

4  computer systems, email servers, computer network, and Internet access provided to them by

5  Riya are to be used solely to perform activities for the benefit of Riya, and that information which

6  resides or is transmitted on these systems is owned by Riya, and is subject to review at the

7  discretion of Riya's management.

8     63. Kirsch intentionally accessed the above-referenced "protected computers" for the

9  purpose of misappropriating Riya's confidential and proprietary business and trade secret

10  information for the benefit of herself and others, including at least competitors and her future

11  employers in violation of 18 U.S.C. § 1030.

12     64. Although Kirsch was allowed to access the above-referenced "protected

13  computers" for work in the furtherance of Riya's interests, she was not authorized to use these

14  protected computers for any other purpose, especially not for the benefit of a competitor seeking

15  to develop competing technology.  For these reasons, Kirsch's access to accomplish the above-

16  referenced malfeasance was "without authorization" as used in 18 U.S.C. § 1030(a)(5).

17     65. In order to determine to what extent its protected computer had been compromised

18  and used impermissibly, Riya had to conduct an examination of its systems to determine what

19  information Kirsch copied and/or downloaded prior to leaving the company (spending at least 20

20  hours reviewing and understanding Kirsch's IMs and email), and hiring a forensic expert to image

21  and examine Kirsch's company-issued laptop to determine the extent to which Kirsch copied,

22  downloaded and/or deleted Riya's proprietary information.  As a result of its internal

23  investigation and the services provided by the forensic expert, Riya has expended in excess of

24  five thousand dollars ($5,000.00).  Accordingly, Riya has suffered a "loss" as that term is used in

25  18 U.S.C. § 1030(e)(11).

26     66. As a direct result of Kirsch conduct, Riya has incurred damages and losses in an

27  amount yet to be determined.

28

- 18 -

COMPLAINT

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1    67.    Riya is entitled to recover from Kirsch the damages and losses it has suffered, as

2    well as any gains, profits, advantages, and unjust enrichment Kirsch has obtained as a result of

3    her wrongful acts as alleged above.  Riya is presently unable to ascertain the full extent of these

4    damages, gains, profits, advantages, and unjust enrichment.

5    68.    Kirsch threatens to continue to engage in the unlawful actions alleged herein, and

6    unless restrained and enjoined will continue to do so, causing irreparable harm to Riya.  Riya

7    cannot ascertain the amount of compensation that could afford Riya adequate relief for Kirsch's

8    continuing unlawful acts.  Riya's remedy at law is, therefore, inadequate to compensate for the

9    injuries threatened.  Accordingly, Riya is entitled to an injunction restraining Kirsch and all

10   persons acting in concert with her, from engaging in any further acts constituting a violation of 18

11   U.S.C. § 1030.

12
### FOURTH CLAIM FOR RELIEF
### STATUTORY UNFAIR COMPETITION
13   (California Business and Professions Code §§ 17200-09)

14   69.    Riya alleges again each and every allegation set forth in the paragraphs above, and

15   incorporates each allegation herein by reference.

16   70.    By the acts alleged in the preceding paragraphs, Kirsch has committed business

17   acts and practices that are unlawful and unfair in violation of California Unfair Competition Law

18   ("UCL"), Cal. Bus. & Prof. Code §§ 17200-09.

19   71.    Kirsch's business acts and practices are unlawful and violate the UCL because

20   Kirsch unlawfully misappropriated and converted Riya's confidential and proprietary business

21   and trade secret information and gained unauthorized access to Riya's computer systems for

22   improper purposes.  Kirsch's business acts and practices violate California laws including but not

23   limited to California Civil Code §§ 3426 *et seq.*, and California Penal Code §§ 499c *et seq.*, and

24   federal laws including but not limited to the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030

25   *et seq.*

26   72.    Kirsch's business acts and practices are unfair and violate the UCL because

27   Kirsch's acts are illegal and impair fair and honest competition and otherwise significantly harm

28   competition in the market for Riya's products and services.

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

COMPLAINT

73. Kirsch may further use, disclose and/or publish the Riya's confidential and proprietary business and trade secret information in her possession, unless enjoined by this Court.

74. By reason of the alleged acts and conduct of Kirsch, Riya has suffered and will imminently suffer further harm, the amount of which will be difficult to ascertain. Riya will be without an adequate remedy at law.

75. Riya is entitled to an injunction restraining Kirsch and all persons acting in concert with her, from using, copying, publishing, disclosing, transferring, and/or selling Riya's confidential and proprietary business and trade secret information, and from obtaining any commercial advantage or unjust enrichment from her misappropriation of that information.

## FIFTH CLAIM FOR RELIEF
## CONVERSION

76. Riya alleges again each and every allegation set forth in the paragraphs above, and incorporates them herein by reference.

77. Riya owns Kirsch's company laptop hard drive and Riya's confidential and proprietary business and trade secret information. Upon information and belief, Kirsch wrongfully acquired all or a portion of Riya's confidential and proprietary business and trade secret information.

78. Riya is entitled to recover from Kirsch for the actual damages sustained by Riya as a result of Kirsch's wrongful acts as described above. The amount of these damages cannot be determined at this time. Riya is further entitled to the return of all of its confidential and proprietary business and trade secret information.

79. Because, on information and belief, Kirsch acted with oppression, malice, and fraud, Riya is entitled to an award of punitive damages and attorneys fees against Kirsch. Riya is further entitled to recover from Kirsch the gains, profits, advantages, and unjust enrichment that they have obtained as a result of her wrongful acts as described herein. Riya is at present unable to ascertain the full extent of these gains, profits, advantages, and unjust enrichment.

COMPLAINT

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

## SIXTH CLAIM FOR RELIEF BREACH OF CONTRACT
## AND DECLARATORY JUDGMENT TO ENFORCE PIIA
(28 U.S.C. Section 2201)

80.    Riya repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

81.    Kirsch was a signatory to the PIIA, which is supported by adequate consideration and is in all respects a valid, enforceable, and binding contract under California law.

82.    The PIIA contained provisions protecting Riya's confidential and proprietary business and trade secret information, by, *inter alia*, (1) forbidding the disclosure and/or dissemination of such material; (2) forbidding Kirsch from removing any such materials from Riya; (3) requiring Kirsch to keep Riya's confidential and proprietary business and trade secret information in confidence and trust; and (4) requiring Kirsch to return all Company Materials to Riya upon the termination of her employment.

83.    Despite the provisions in the PIIA, Kirsch disclosed Riya's confidential and proprietary business and trade secret information to third parties, including to a competitor, took Riya's Company Materials outside of Riya, and failed to return all Company Materials upon the termination of her employment with Riya.

84.    By reason of Kirsch's above-alleged acts and conduct, Riya has already suffered, and will continue to suffer, harm and damage. This harm will be difficult to ascertain and may be irreparable, leaving Riya without an adequate remedy at law.

85.    Riya is entitled to an injunction restraining Kirsch and all persons acting in concert with her, from using, copying, publishing, disclosing, transferring, and/or selling Riya's confidential and proprietary business and trade secret information, and from obtaining any commercial advantage or unjust enrichment from her misappropriation of that information.

86.    Riya is further entitled to recover from Kirsch the damages it has suffered, as well as any gains, profits, advantages, and unjust enrichment Kirsch has obtained as a result of her wrongful acts as alleged above. Riya is presently unable to ascertain the full extent of these damages, gains, profits, advantages, and unjust enrichment.

- 21 -

## SEVENTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY
(28 U.S.C. Section 2201)

87.    Riya repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

88.    By virtue of her employment with Riya, Kirsch owed a duty of loyalty to Riya. Kirsch acknowledged that duty in the PIIA -- "I understand that my employment creates a relationship of confidence and trust between me and the Company with respect to Proprietary Information." Ex. A § 1.

89.    Additionally, as a high-ranking executive, Kirsch owed a fiduciary duty to Riya.

90.    Kirsch willfully and intentionally breached these duties by disclosing Riya's confidential and proprietary business and trade secret information and by taking such materials outside of Riya and not returning them upon termination, all in violation of the PIIA.

91.    As a direct and proximate result of Kirsch's conduct as alleged hereinabove, Riya has suffered damages in an amount to be proven at trial, including but not limited to salary, benefits and other employment compensation provided to Kirsch during the period of time that she was breaching her duty of loyalty to Riya.

92.    Because Kirsch acted with oppression, malice, and fraud, Riya is entitled to an award of punitive damages and attorneys fees against Kirsch. Riya is further entitled to recover from Defendants the gains, profits, advantages, and unjust enrichment that they have obtained as a result of their wrongful acts as described herein. Riya is at present unable to ascertain the full extent of these gains, profits, advantages, and unjust enrichment.

93.    Because, on information and belief, Kirsch acted with oppression, malice, and fraud, Riya is entitled to an award of punitive damages and attorneys fees against Kirsch. Riya is further entitled to recover from Kirsch the gains, profits, advantages, and unjust enrichment that they have obtained as a result of her wrongful acts as described herein. Riya is at present unable to ascertain the full extent of these gains, profits, advantages, and unjust enrichment.

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 22 -

1

2

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

## SEVENTH CAUSE OF ACTION
### (Money Had and Received)

94.     Riya repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

95.     At all relevant times during which Kirsch was employed by Riya, Riya properly paid her all compensation and benefits to which she had earned or was otherwise entitled.

96.     At certain time periods during her employment, however, Kirsch was in reality working exclusively or predominately to further the interests of a competitor and/or future employer, despite being an employee of Riya and receiving her agreed-upon compensation from Riya.

97.     In such circumstances, where compensation is received by an employee only because she fraudulently conceals his or her disloyalty from the employer, California law recognizes that the employee forfeits the right to the compensation in question, and the employer may recover the sums paid.

98.     Accordingly, Riya is entitled to recover from Kirsch the full compensation it paid to her during the time she was actively working for the benefit of a competitor and/or against the interests of Riya.  Riya is informed and believes, and on that basis alleges, that this amount will total at least $107,991.71.

## PRAYER FOR RELIEF

Riya prays for judgment against Kirsch as follows:

1.     For a writ of possession, a temporary restraining order, and preliminary and permanent injunctive relief, requiring defendant Deborah Beth Kirsch, and all those acting in concert with her, to immediately return to Riya any and all Riya confidential and proprietary business and trade secret information in his, her or its possession, custody or control or that subsequently comes into his, her or its possession, custody or control, including the Riya confidential and proprietary business and trade secret information described above, and to account for each and every disclosure, transfer, and/or other use of any part of the this

- 23 -

1  information, including an accounting of each any every individual given access to any part of this

2  information and the timing, extent and nature of that access;

3       2.    For temporary, preliminary, and permanent injunctive relief, enjoining and

4  restraining Deborah Beth Kirsch from the wrongful acts and conducts set forth above, including

5  an order that she, and all other persons acting in active concert or privity or in participation with

6  her, be enjoined:

7      (a) from further disclosing or otherwise using Riya's confidential and proprietary

8         business and trade secret information, whether in electronic, hard-copy, or

9         other form, wrongfully obtained or retained from Riya, including Riya's

10        confidential and proprietary business and trade secret information described

11        above, (1) by citing, quoting, making notes from, or otherwise using this

12        information in the creation of any material, whether written, recorded or

13        otherwise; (2) making any copies of such information, whether electronically

14        or by other means; (3) communicating such information to any person or third

15        party; (4) transferring such information to any other storage media, computer,

16        server, facility, or other tangible or intangible thing where such information

17        might be stored; and (5) or any other means; and

18     (b) from transferring Riya's confidential and proprietary business and trade secret

19        information, whether in electronic, hard-copy, or other form, wrongfully

20        obtained from Riya, including the Riya's confidential and proprietary business

21        and trade secret information; and

22     (c) from contacting any current or former employee of Riya or from taking any

23        other steps for the purpose of wrongfully obtaining Riya's confidential and

24        proprietary business and trade secret information, including Riya's confidential

25        and proprietary business and trade secret information described above;

26      2.    For an award of restitution, unjust enrichment, and compensatory damages

27 according to proof at trial;

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 24 -

COMPLAINT

1            3.      For statutory exemplary damages and punitive damages according to proof

2 at trial;

3            4.      For attorneys' fees and costs of suit herein incurred; and

4            5.      For such other, further, and/or different relief as the Court may deem just

5 and proper.

6         Dated: January 24, 2008            Respectfully Submitted,

7                                  ERIC J. AMDURSKY

8                                  LORI E. ROMLEY<br>                                 JUSTIN D. WALKER

9                                  O'MELVENY & MYERS LLP

10

11                       By: _Lori E Romley_

12                           Lori E. Romley<br>                         Attorneys for Plaintiff<br>                         RIYA, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O'MELVENY & MYERS LLP<br>ATTORNEYS AT LAW<br>MENLO PARK

           COMPLAINT

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b), Federal Rules of Civil Procedure, and Civil Local Rule 3-6, Riya demands trial by jury for all of the issues pled in the above-captioned matter so triable.


Dated: January 24, 2008

ERIC J. AMDURSKY
LORI E. ROMLEY
JUSTIN D. WALKER
O'MELVENY & MYERS LLP


By: *Lori E. Romley*
Lori E. Romley
Attorneys for Plaintiff
RIYA, INC.

MP1:1012359.4

- 26 -

COMPLAINT

# EXHIBIT A

# EMPLOYEE
# PROPRIETARY INFORMATION
# AND INVENTIONS AGREEMENT

The following confirms an agreement between me and Riya, Inc., a California corporation (the "Company"), which is a material part of the consideration for my employment or continued employment with the Company. and which is effective as of the date my employment with the Company commenced:

1.    Proprietary Information.  I understand that the Company possesses and will possess Proprietary Information that is important to its business.  For purposes of this Agreement, "Proprietary Information" is information that was or will be developed, created. or discovered by or on behalf of the Company. or that became or will become known by. or was or is conveyed to the Company, that has commercial value in the Company's business. "Proprietary Information" includes. without limitation, information (whether conveyed orally or in writing) about algorithms, application programming interfaces. protocols. trade secrets, computer software, designs, technology, ideas, know-how, products. services. processes, data. techniques. improvements. inventions (whether patentable or not), works of authorship. business and product development plans, the salaries and terms of compensation of other employees, customer lists and other information concerning the Company's actual or anticipated business, research or development. or that is received in confidence by or for the Company from any other person.  I understand that my employment creates a relationship of confidence and trust between me and the Company with respect to Proprietary Information.

2.    Company Materials.  I understand that the Company possesses or will possess "Company Materials" that are important to its business.  For purposes of this Agreement, "Company Materials" are documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of the Company, whether such documents have been prepared by me or by others.  "Company Materials" include, without limitation. blueprints, drawings, photographs. charts. graphs. notebooks. customer lists. computer software, media or printouts. sound recordings and other printed, typewritten or handwritten documents. as well as samples, prototypes. models. products and the like.

3.    Intellectual Property.  In consideration of my employment with the Company and the compensation received by me from the Company from time to time, I hereby agree as follows:

3.1    All Proprietary Information and all right title and interest in and to patents. patent rights. copyright rights. mask work rights, trade secret rights, and other intellectual property and proprietary rights anywhere in the world (collectively "Rights") in connection therewith shall be the sole property of the Company. I hereby assign to the Company any Rights I may have or acquire in such Proprietary Information. At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company except as may be necessary and appropriate in the ordinary course of performing my duties to the Company.

MP1:958596.2

3.2     All Company Materials shall be the sole property of the Company. I agree that during my employment with the Company, I will not remove any Company Materials from the business premises of the Company or deliver any Company Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment. I further agree that, immediately upon the termination of my employment by me or by the Company for any reason, or for no reason, or during my employment if so requested by the Company, I will return all Company Materials, apparatus, equipment and other physical property, or any reproduction of such property, excepting only (i) my personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copy of this Agreement.

3.3     I understand, in addition, that the Company has received and in the future will receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose (to anyone other than Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

3.4     I will promptly disclose in writing to my immediate supervisor or to any persons designated by the Company, all "Inventions" (which term includes improvements, inventions (whether or not patentable), works of authorship, trade secrets, technology, algorithms, computer software, protocols, formulas, compositions, ideas, designs, processes, techniques, know-how and data) made or conceived or reduced to practice or developed by me (in whole or in part, either alone or jointly with others) during the term of my employment. I will also disclose to the Company, Inventions conceived, reduced to practice, or developed by me within six months of the termination of my employment with the Company; such disclosures shall be received by the Company in confidence, to the extent they are not assigned in Section 3.5 below, and do not extend such assignment. I will not disclose Inventions covered by Section 3.5 to any person outside the Company unless I am requested to do so by management personnel of the Company.

3.5     I agree that all Inventions that I make, conceive, reduce to practice or develop (in whole or in part, either alone or jointly with others) during my employment shall be the sole property of the Company to the maximum extent permitted by Section 2870 of the California Labor Code, a copy of which is attached and I hereby assign such Inventions and all Rights therein to the Company. No assignment in this Agreement shall extend to inventions, the assignment of which is prohibited by Labor Code Section 2870. The Company shall be the sole owner of all Rights in connection therewith.

3.6     I acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of my employment and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C., Section 101).

3.7    I agree to perform, during and after my employment, all acts deemed necessary or desirable by the Company to permit and assist it, at the Company's expense, in evidencing, perfecting, obtaining, maintaining, defending and enforcing Rights and/or my assignment with respect to such Inventions in any and all countries. Such acts may include, without limitation, execution of documents and assistance or cooperation in legal proceedings. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorneys-in-fact, with full power of substitution, to act for and in my behalf and instead of me, to execute and file any documents and to do all other lawfully permitted acts to further the above purposes with the same legal force and effect as if executed by me.

3.8    Any assignment of copyright hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights"). To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent. I will confirm any such waivers and consents from time to time as requested by the Company.

3.9    I have attached hereto a complete list of all existing Inventions to which I claim ownership as of the date of this Agreement and that I desire to specifically clarify are not subject to this Agreement, and I acknowledge and agree that such list is complete. If no such list is attached to this Agreement, I represent that I have no such Inventions at the time of signing this Agreement.

4.    <u>Non-Solicitation.</u>  During the term of my employment and for one year thereafter, I will not encourage or solicit any employee or consultant of the Company to leave the Company for any reason. However, this obligation shall not affect any responsibility I may have as an employee of the Company with respect to the bona fide hiring and firing of Company personnel.

5.    <u>Non-Competition.</u>  I agree that during my employment with the Company, I will not engage in any employment, business, or activity that is in any way competitive with the business or proposed business of the Company, and I will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company. The provisions of this paragraph shall apply both during normal working hours and at all other times including, without limitation, nights, weekends and vacation time, while I am employed with the Company.

6.    <u>No Conflict with Obligation to Third Parties.</u>  During my employment by the Company, I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust

prior to my employment with the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith or in conflict with my employment with the Company.

   7. <u>At-Will Employment</u>. I agree that this Agreement is not an employment contract and that I have the right to resign and the Company has the right to terminate my employment at any time, for any reason, with or without cause.

   8. <u>Other Employee Obligations</u>. I agree that this Agreement does not purport to set forth all of the terms and conditions of my employment, and that as an employee of the Company I have obligations to the Company that are not set forth in this Agreement.

   9. <u>Arbitration</u>. We agree to arbitrate before a neutral arbitrator any and all disputes arising from or relating to Employee's recruitment or employment with the Company, or the termination of that employment, including claims against any current or former agent or employee of the Company, whether arising under a tort, contract, statute, regulation, or ordinance now in existence or which may in the future be enacted or recognized, including without limitation claims for employment discrimination under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the California Fair Employment and Housing Act, the Employee Retirement Income Securities Act, the Racketeer Influenced and Corrupt Practices Act, or any other federal, state or local law or regulation now in existence or hereinafter enacted and as amended from time to time concerning any part of the employment relationship, except: (a) claims for benefits under the unemployment insurance or workers' compensation laws, which will be resolved pursuant to those laws; (b) claims concerning the validity, infringement or enforceability of patent rights, copyright, trademark, license or any other intellectual property rights; (c) claims concerning the validity or misuse of trade secrets; (d) claims concerning the validity, enforceability or breach of the Proprietary Information and Inventions Agreement to which the Employee and the Company are signatory; and (e) any other dispute or claim that has been expressly excluded from arbitration by statute ("Arbitrable Claim"). Also, nothing in this Agreement prohibits the filing of a charge or complaint with a federal, state, or local administrative agency charged with overseeing any applicable federal, state or municipal law or regulation. Any Arbitrable Claim that is not resolved through the federal, state, or local agency must be submitted to arbitration in accordance with this Agreement. Binding arbitration will be conducted in Santa Clara County, or in any county in which the venue would have been proper if the Employee were free to bring the dispute(s) or claim(s) in court. Binding arbitration will be conducted in accordance with the rules and regulations of the American Arbitration Association (AAA) then in effect. We agree that the Company will bear the arbitrator's fee, any other type of expense or cost the employee would not be required to bear if he or she were free to bring the dispute or claim into court, and any cost otherwise required by California law. We understand and agree that, by signing this Agreement, we are expressly waiving any and all rights to a trial before a court or jury or before a government agency regarding any Arbitrable Claim.

   10. <u>Survival</u>. I agree that my obligations under Sections 3.1 through 3.8, Section 4, and Section 9 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is

voluntary or involuntary on my part, and that the Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine.

11.    Controlling Law; Severability.  I agree that any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of California without regard to the conflict of laws provisions thereof.  I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable California law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms.

12.    Successors and Assigns.  This Agreement shall be effective as of the date I execute this Agreement and shall be binding upon me, my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

13.    Legal and Equitable Remedies.  Because my services are personal and unique and because I may have access to and become acquainted with the Proprietary Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond, without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

14.    Modification.  This Agreement can only be modified by a subsequent written agreement executed by an officer of the Company.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION.  NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT.  I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT ONE COUNTERPART WILL BE RETAINED BY THE COMPANY AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.  I UNDERSTAND THAT WE ARE WAIVING ALL RIGHTS TO A TRIAL OR HEARING BEFORE A COURT OR JURY OR GOVERNMENT AGENCY AS TO ANY ARBITRABLE CLAIM.

_D Beth Kusch_

Employee Signature

Name of employee: _Deborah Beth Kusch_

Date: _9/14_, 200_6_

Accepted and Agreed to:

RIYA, INC.

By: _____

Name: __MUNJAL L SHAH__

Title: ____C EO____

## ATTACHMENT A

Gentlemen:

      1.    The following is a complete list of Inventions relevant to the subject matter of my employment with Riya , Inc. (the "Company") that have been made, conceived, developed or first reduced to practice by me (in whole or in part, either alone or jointly with others) prior to my employment by the Company that I desire to clarify are not subject to the Company's Employee Proprietary Information and Inventions Agreement.

☐     No Inventions

☐     See below:

☐     Additional sheets attached

      2.    I propose to bring to my employment the following materials and documents of a former employer:

☐     No materials or documents

☐     See below:

_____

Employee Signature

Name of employee: _D. Beth Kirsh_

MP1:958596.2

## ATTACHMENT B

Section 2870. Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

# EXHIBIT B

# Employee Handbook





TriNet
TOTAL HR SERVICES

© 2006, TriNet Group, Inc.
All Rights Reserved.

# Chapter Two: General Employment Conduct

We are committed to the highest standards of conduct at every level, and we depend upon the personal and professional integrity and dedication of all employees to help uphold these standards. Your honorable character and helpful behavior are assets and a credit to the company. In the same vein, we will not tolerate conduct that interferes with company operations, discredits the company, is illegal or is offensive to customers or fellow employees. To help maintain a positive work environment for you and your co-workers, we rely on you to behave according to the provisions set forth in this chapter, elsewhere in this handbook, and in other company policy and directives. Failure to comply with these guidelines may result in disciplinary action, up to and including termination. This section is not intended to include every situation that might arise, nor does it affect the at-will employment policy described in this handbook.

## At-Will Employment

As an employee, you have the right to terminate your employment at any time, with or without advance notice, for any or no reason. Similarly, we have the option of ending your employment with us at any time, with or without cause or prior notice. The terms and conditions of employment including, but not limited to, demotion, promotion, transfer, compensation, benefits, duties, and location of work, may also be changed at any time, with or without cause or prior notice.

This is called at-will employment, and nothing in this handbook or any other statement, written or verbal, has the power to alter it.  Only a written agreement signed by your company president can change at-will employment.

## Expectations and Restrictions

The following expectations apply to all employees at all work locations:

- Take good care of any company information or equipment assigned to you.
- Avoid conflicts of interest, including other employment or other outside activities that could interfere with your duties or assignments with the company. Please inform your manager or TriNet of any possible conflicts.
- Report any work-related illness or injury to TriNet's Solution Center (800.638.0461, M-F 6 a.m.-6 p.m., Pacific Time, 9 a.m.-9 p.m. Eastern Time) within 24 hours, and let your manager or TriNet know about any unsafe work conditions or damaged equipment as soon as possible.

Examples of misconduct include, but are not limited to, the following:

- Refusing to accept legitimate work assignments
- Refusing to follow your manager's instructions or directions or other insubordinate conduct
- Conducting personal business, including outside employment, on company time or with company equipment, supplies, or other materials
- Possessing or using weapons, liquor, or illicit drugs in the workplace
- Sleeping or being under the influence of alcohol, drugs, or intoxicants while on company time
- Lying or falsifying information, including time reports
- Damaging, destroying, removing without authority, or failing to return, any property (physical or intellectual) belonging to the company, TriNet, or another employee
- Fighting, horseplay, practical jokes, or other disorderly conduct that could endanger or disturb any employee or visitor on company premises or time
- Interfering with the performance and/or business of other employees or visitors
- Threatening, intimidating, or coercing any employee or visitor, including the use of abusive or vulgar language

To prevent possible conflicts of interest, the following behavior is deemed unacceptable and unethical:

- Receiving or giving of merchandise, money, services, travel, accommodations, or lavish entertainment that might appear to have been given to influence a business decision. Gifts offered or received at any time that are of more than minimal or token value shall not be accepted and shall be returned to the sender with an appropriate explanatory note or letter.
- Maintaining personal, business, or financial relationships with a customer or vendor where the employee has control or influence over the company's relationship with that customer or vendor. For example, employees should not borrow from or lend personal funds to a customer or vendor of the employee's division.
- Using information developed or learned on the job for personal or familial benefit. This includes the use of company databases, financial information, and intellectual property.
- Maintaining outside directorship, employment, or political office that might appear to conflict or compete with an employee's responsibilities.
- Conducting company business with or using position or authority to influence the company to conduct business with family members.
- Sharing confidential or proprietary company related information with business associates or representatives of other companies.

The list above serves only to illustrate sources of possible conflicts of interest and does not constitute a complete list of all the situations that may result in a conflict of interest. Ultimately, it is the responsibility of each employee to avoid any situation that could affect his/her ability to judge situations independently and objectively or even appear to be a conflict of interest. It is important to note that under certain circumstances, conflicts of interest can amount to violations of criminal law. Any doubts should be resolved in a discussion with your manager, TriNet Human Resources staff, or the company's legal counsel.

**Employment of Relatives and Significant Others.**
To avoid conflicts of interest and promote stability and goodwill in the workplace, we don't usually hire or transfer relatives into positions where they supervise or are supervised by another close family member. We also try to avoid placing them in positions where they work with or have access to sensitive information about family members. The same general considerations apply if two employees marry or become involved in a domestic-partner relationship. If a supervisory, security, morale, safety, or other conflict results from the relationship, we reserve the right to use our discretion in hiring and placing employees in a manner designed to avoid these concerns.  One of the employees may be transferred—or if necessary terminated—to resolve the situation.

By relatives we mean your spouse, parents, legal guardians, siblings, children (natural, step-, or adopted), grandparents, grandchildren, or current in-laws. This policy also applies to significant others or domestic partners.  There may be other considerations or restrictions based on job requirements and situations specific to your company. Check with your manager for clarification.

**Confidential Information**
As an employee, you may learn information about the company that is not known by the general public. This information may include trade secrets, business plans, financial results, marketing and sales plans, or acquisition or disposition of company assets. Regardless of whether this type of information is specifically classified as confidential, it is each employee's responsibility to keep this information in confidence. All items such as manuals, reports, records and statements, other than those made available to the general public, are the property of the company, generally to be kept at the company's place of business, and are to be returned to the company when requested and upon termination.

**Recognizing & Reporting a Conflict**
We expect employees to be familiar with this Code of Business Ethics and Conduct and to comply with it. Employees are also expected to rely on their own high standards of judgment, and to seek the advice and counsel of management or TriNet Human Resources staff to clarify issues not covered by these guidelines or by good judgment.

- All business equipment, electronic and telephone communications systems, and all communications and stored information transmitted, received, or contained in the company's information systems are the company's property and are to be used for job-related purposes unless otherwise authorized by the company.
- Employees are not to download or otherwise import programs, files or documents into the company's computer equipment except as authorized by the company.
- The company may monitor use of any systems and equipment to ensure proper usage, including compliance with software licensing, copyright and illegal usage laws.
- The Employee in whose name an account is issued by the company is responsible for its proper use at all times.
- The company reserves the right to determine the appropriate use of electronic media and services and its decision will be final.
- Employees who violate this or any other company policy related to electronic media are subject to discipline, up to and including termination of employment.
- The company assumes no liability for loss, damage, disclosure or misuse of any non-company data or communications transmitted or stored on the company's computer equipment.

Please contact your manager for more specific information on your company's electronic media policies.

### Confidential Information

To jeopardize the security of restricted information is detrimental to company and employee security. We need all employees to do their part in protecting such information by not disclosing any trade secrets or confidential information or using it in any manner that is unauthorized or detrimental to the best interests of the company. Some employees who have access to confidential, sensitive, or proprietary information about the company or its clients, processes, and employees may also need to sign a Proprietary Information and Inventions Agreement (PIIA) as a condition of employment. Employees who disclose trade secrets or confidential company information may be subject to disciplinary action, up to and including discharge.

### Requests by Third Parties for Company Information

All inquiries received by the company or TriNet from someone outside the company regarding a present or former employee must be directed to your manager, unless you have specific authority to respond to such an inquiry. No other manager or employee is authorized to release references for current or former employees. The company's policy as to references for employees who have left the company is to disclose only the dates of employment and the title of the last position held. If an employee authorizes disclosure in writing, the company will also provide a prospective employer with the amount of salary or wage last earned.

Also, you may be approached for interviews or comments by the news media, analysts and/or customers/vendors on events and issues that may impact the company image. Only specifically designated contact people should provide responses on behalf of the company in these instances. If you are unsure who should respond, contact your manager immediately.

### Company-Furnished Equipment or Materials

You're responsible for taking good care of the equipment or materials furnished to you by the company, which remain company property and should only be used for legitimate company business. In the interests of maintaining a safe and orderly workplace, unauthorized removal of any company property (or that of another employee) is considered a grave offense, and may subject you to serious consequences, regardless of seniority or past performance. If you leave our employ, you will need to return any company property in your possession.

# EXHIBIT C

December 15, 2007

7:37:58 PM Beth Kirsch: hey you there?
7:42:46 PM samosborn415: Hey
7:42:52 PM Beth Kirsch: how are you
7:43:08 PM samosborn415: What's going on
7:43:16 PM Beth Kirsch: interesting few days
7:43:21 PM Beth Kirsch: you know what happened
7:43:22 PM samosborn415: Ok
7:43:27 PM Beth Kirsch: over the last three months
7:43:31 PM Beth Kirsch: I got really blue
7:43:45 PM Beth Kirsch: and that is why I could not do work and got really
focused on me
7:43:57 PM Beth Kirsch: when I figured this out
7:43:59 PM Beth Kirsch: I was like
7:44:01 PM Beth Kirsch: that was it
7:44:09 PM Beth Kirsch: anyway
7:44:15 PM Beth Kirsch: I'll tell you more on monday
7:44:22 PM Beth Kirsch: thank you for being so supportive
7:45:10 PM Beth Kirsch: :)
7:45:57 PM samosborn415: How r things there
7:46:05 PM Beth Kirsch: OK
7:46:18 PM Beth Kirsch: hard
7:46:24 PM Beth Kirsch: how are things with you and Sally
7:46:32 PM Beth Kirsch: she had a hard few days
7:48:39 PM Beth Kirsch: I still can't believe I'm leaving
7:48:51 PM Beth Kirsch: I actually do think it's best
7:50:05 PM Beth Kirsch: u there?
8:00:48 PM samosborn415: Yeah I bet
8:00:58 PM Beth Kirsch: well
8:01:10 PM Beth Kirsch: I think in many ways this job was hurting me
8:01:19 PM Beth Kirsch: the last three months were really a disaster
8:01:35 PM samosborn415: yeah its hard to believe u leaving
8:01:54 PM Beth Kirsch: I'm really sad about it
8:02:18 PM samosborn415: 1 more week?
8:02:23 PM Beth Kirsch: yes
8:02:26 PM Beth Kirsch: and it's killing me
8:02:27 PM Beth Kirsch: lol
8:02:38 PM Beth Kirsch: you know I want to hand everything off well
8:02:41 PM Beth Kirsch: but man it's hard
8:03:13 PM Beth Kirsch: I can't believe I screwed up so much
8:05:19 PM Beth Kirsch: I still think they are chasing the wrong money
8:05:51 PM samosborn415: Yeah 3 tough months
8:06:00 PM samosborn415: Well it will be good too. U'll find something btr
8:06:04 PM Beth Kirsch: I got really depressed
8:06:10 PM Beth Kirsch: and it showed
8:06:13 PM Beth Kirsch: and working with M
8:06:16 PM Beth Kirsch: made it worse
8:06:17 PM Beth Kirsch: I think
8:06:36 PM Beth Kirsch: I also believe
8:06:40 PM Beth Kirsch: that what I want to do
8:06:43 PM Beth Kirsch: and what Like.com
8:06:48 PM Beth Kirsch: needs me to do are different
8:07:09 PM Beth Kirsch: I looked at you, Eric and Baris working together
8:07:22 PM Beth Kirsch: driving revenue and it's so cool
8:10:23 PM samosborn415: Yeah its tough to work for m. U two got too close
8:11:16 PM Beth Kirsch: yes
8:11:24 PM Beth Kirsch: but he is like that
8:11:46 PM Beth Kirsch: I messed up though
8:11:56 PM Beth Kirsch: and he pushed me to hard
8:13:41 PM samosborn415: U got too excited about being his confidant maybe
8:14:06 PM Beth Kirsch: I think a lot of things went wrong
8:14:31 PM Beth Kirsch: I think also he misunderstood a stuff that got back to
him too

```
8:14:59 PM Beth Kirsch: it was more than M
8:15:00 PM Beth Kirsch: though
8:15:06 PM Beth Kirsch: AZ has issues with me
8:15:12 PM Beth Kirsch: and some engineers
8:15:42 PM samosborn415: Too buddy buddy
8:16:00 PM samosborn415: Yep
8:17:43 PM Beth Kirsch: odd
8:17:50 PM Beth Kirsch: the whole thing
8:17:54 PM Beth Kirsch: he is a odd man
8:17:56 PM Beth Kirsch: in someways
9:02:21 PM samosborn415: After this wk ur done?
9:02:27 PM Beth Kirsch: yes
9:02:48 PM Beth Kirsch: I was trying to leave on wed
9:02:56 PM Beth Kirsch: but M wont let me go until Friday
```

# EXHIBIT D

December 15, 2007

```
9:21:43 PM Beth Kirsch: burak is running the a/b tests
9:22:06 PM Beth Kirsch: I was going to be stuck doing sales
9:23:00 PM samosborn415: Wow
9:23:12 PM Beth Kirsch: did you read his email
9:24:29 PM Beth Kirsch: I do think in the end this is for the best
9:24:30 PM Beth Kirsch: but man
9:24:32 PM Beth Kirsch: it's hard
9:24:52 PM Beth Kirsch: I think Munjal and I have an unhealthy relationship
9:25:03 PM Beth Kirsch: he is abusive at times
9:34:18 PM samosborn415: I had a good chat with eric and baris on friday about
a\b
9:35:27 PM Beth Kirsch: yay
9:41:13 PM samosborn415: Yeah
9:41:24 PM Beth Kirsch: I can'[t believe I'm leaving
9:41:32 PM Beth Kirsch: all this stuff I've been fighing for
9:41:38 PM Beth Kirsch: finally coming online
9:50:15 PM samosborn415: Yeah I got laid off by military.com when they were
having trouble. I
survived 3 prior rounds. But it was still hard.
9:50:33 PM Beth Kirsch: YAY
9:50:37 PM Beth Kirsch: oh
9:50:38 PM Beth Kirsch: yeah
9:50:41 PM Beth Kirsch: the issue here
9:50:52 PM Beth Kirsch: is I have given so much to this company
9:50:56 PM Beth Kirsch: I want to see it through
9:50:59 PM Beth Kirsch: but you know
9:51:06 PM Beth Kirsch: I worry abotu the exit
9:51:13 PM Beth Kirsch: here
9:51:35 PM Beth Kirsch: I feel like I let M down too
9:51:37 PM Beth Kirsch: and that hurts
9:51:43 PM Beth Kirsch: he is so angry at me
9:52:12 PM Beth Kirsch: but live and learn I guess
9:52:31 PM samosborn415: Yay?
9:52:40 PM Beth Kirsch: I meant
9:52:45 PM Beth Kirsch: yeah
9:52:50 PM Beth Kirsch: sorry
10:14:24 PM samosborn415: Well u don't need to rely on his recomendation
10:14:49 PM Beth Kirsch: he said he would give me a good one
10:48:41 PM Beth Kirsch: hey
10:48:45 PM Beth Kirsch: your sidekick
10:48:48 PM Beth Kirsch: do you like it
10:55:46 PM samosborn415: Its okay. Only good for internet tho
10:55:55 PM Beth Kirsch: Ok
10:56:05 PM Beth Kirsch: trying to deal with a new phone I like the BB i have
10:56:25 PM samosborn415: U can always have a friend check to make sure he
gives a good
reco
10:56:39 PM Beth Kirsch: I doubt he will lie
10:56:43 PM Beth Kirsch: to me about this
10:56:52 PM Beth Kirsch: he gave Ann a good recommedation and mark too
10:56:59 PM Beth Kirsch: I added more value than that
10:57:15 PM Beth Kirsch: people generally say no
10:57:26 PM Beth Kirsch: when you ask if they will be a recommedation
10:57:35 PM Beth Kirsch: if they are uncomfortable
10:57:38 PM samosborn415: Yeah u should keep bb
10:58:05 PM Beth Kirsch: people will back check me with Munjal
10:58:09 PM Beth Kirsch: if I give him or not
10:58:24 PM Beth Kirsch: I made me a rich man
10:58:25 PM Beth Kirsch: well
10:58:29 PM Beth Kirsch: he thinks that
10:58:32 PM Beth Kirsch: but you know
10:58:42 PM Beth Kirsch: I'm not super bullish on this model
```

# EXHIBIT E

December 3, 2007

```
11:09:07 PM Beth Kirsch: you want the BoD pack
11:09:12 PM samosborn415: Who?
11:09:26 PM Beth Kirsch: look at the linkedin
11:09:29 PM Beth Kirsch: a brander
11:09:30 PM Beth Kirsch: sam
11:09:34 PM Beth Kirsch: now that is what we need
11:10:13 PM Beth Kirsch: sending you the BoD pack
11:10:18 PM Beth Kirsch: needs to stay between us
11:11:45 PM samosborn415: Yeah send it over
11:11:52 PM Beth Kirsch: I jjusut did
11:11:54 PM Beth Kirsch: accept it
11:12:00 PM samosborn415: undertstood. Thx

            * * * *

11:13:03 PM samosborn415: Can't receive it on this I'm. Send via email
11:13:12 PM Beth Kirsch: personal email
11:13:15 PM samosborn415: On my sidekick so Im is limited
11:13:18 PM Beth Kirsch: sending from Y!
```

# EXHIBIT F

December 16, 2007

8:56:12 PM dldaddy: ?
8:56:29 PM Beth Kirsch: huh?
8:56:38 PM Beth Kirsch: I don't want to talk abotu this more on my work computer
8:56:43 PM Beth Kirsch: we can talk on the hone.
8:56:48 PM Beth Kirsch: phone
8:56:55 PM Beth Kirsch: I deleted this
8:56:57 PM Beth Kirsch: chat
8:57:32 PM dldaddy: OK
9:00:08 PM Beth Kirsch: I think you should build what Riya built
9:00:11 PM Beth Kirsch: I'll tell you how
9:06:12 PM dldaddy: I'm trying to!
9:06:20 PM Beth Kirsch: Well
9:06:21 PM dldaddy: I need the product pages first
9:06:25 PM Beth Kirsch: You need three
9:06:27 PM Beth Kirsch: researchers

* * * *

9:09:10 PM dldaddy: Let's discuss it in January
9:09:30 PM Beth Kirsch: I thought it might be good to come visit you
9:09:38 PM Beth Kirsch: and just bat around what I learned at Riya
9:09:39 PM Beth Kirsch: for you

# EXHIBIT G

December 20, 2007

11:42:13 AM dldaddy: Just so you know, you are not allowed to say ANYTHING negative
about your next job for 12-18 months
11:42:15 AM dldaddy: PERIOD
11:42:19 AM dldaddy: No exceptions
11:42:52 AM Beth Kirsch: :)
11:42:53 AM Beth Kirsch: k
11:43:20 AM Beth Kirsch: stealing software from Riya

# EXHIBIT H

From: Munjal Shah <munjal@like.com>
To: Beth Kirsch <bkirsch2000@yahoo.com>
Cc: Amdursky, Eric; Lazarow, Warren
Sent: Tue Jan 15 10:22:11 2008
Subject: Legal Action

Beth,

I called you on this but got vmail.

As we were perusing your laptop for the Saks IO the other day an old
IM with dldaddy (David Lewis) suddenly popped up (must have been left
open or your computer auto-logged you in). It had had some racial
overtones. Upon reading this we decided to read more of your IMs
which were logged on the corporation's laptop, of which there were
thousands. I was shocked by what I read.

Worst off it seems you have offered to tell David confidential
information about Like.com's trade secrets/proprietary information and
on a number of occasions have violated the confidentiality of Like.com
with outside parties and with subordinates (by sharing board packets,
etc). Finally you explicitly indicate that you are stealing software
from the company.

After considering this, the board of directors and I have decided that
you will be receiving a letter from our lawyer, followed by an
injunction and a lawsuit against you by the company. I recommend you
do not delete any further IMs or emails as it could be an obstruction
of justice which is criminal and could include jail time, per my
understanding. Yahoo tends to keep deleted emails for a period of
time anyways for the case of such criminal investigations.

On a side note, I ended up reading ALL of your IMs (as I was searching
for your IP violations) and am extremely disappointed with the way in
which you conducted yourself while here. I have never seen such
unethical and even criminal behavior from an executive before.

Munjal

# EXHIBIT I

LAW OFFICE OF
# DEREK A. ELETICH
155 FOREST AVENUE
PALO ALTO, CALIFORNIA 94301-1615
TELEPHONE (650) 543-5477 • FACSIMILE (650) 429-2028
EMAIL: DEREKELETICH@EARTHLINK.NET

January 18, 2008

## Via Electronic Mail and Facsimile

Eric J. Amdursky
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, CA 94025

Re:    Riya, Inc.

Dear Mr. Amdursky:

I represent D. Beth Kirsch. Please direct all future correspondence and/or inquiries regarding Ms. Kirsch to me.

I have just been retained by Ms. Kirsch, and will substantively respond to your January 16, 2008 letter to Ms. Kirsch regarding Riya, Inc. next week.

Very truly yours,

DEREK A. ELETICH

# EXHIBIT B

December 15, 2007

7:37:58 PM Beth Kirsch: hey you there?
7:42:46 PM samosborn415: Hey
7:42:52 PM Beth Kirsch: how are you
7:43:08 PM samosborn415: What's going on
7:43:16 PM Beth Kirsch: interesting few days
7:43:21 PM Beth Kirsch: you know what happened
7:43:22 PM samosborn415: Ok
7:43:27 PM Beth Kirsch: over the last three months
7:43:31 PM Beth Kirsch: I got really blue
7:43:45 PM Beth Kirsch: and that is why I could not do work and got really
focused on me
7:43:57 PM Beth Kirsch: when I figured this out
7:43:59 PM Beth Kirsch: I was like
7:44:01 PM Beth Kirsch: that was it
7:44:09 PM Beth Kirsch: anyway
7:44:15 PM Beth Kirsch: I'll tell you more on monday
7:44:22 PM Beth Kirsch: thank you for being so supportive
7:45:10 PM Beth Kirsch: :)
7:45:57 PM samosborn415: How r things there
7:46:05 PM Beth Kirsch: OK
7:46:18 PM Beth Kirsch: hard
7:46:24 PM Beth Kirsch: how are things with you and Sally
7:46:32 PM Beth Kirsch: she had a hard few days
7:48:39 PM Beth Kirsch: I still can't believe I'm leaving
7:48:51 PM Beth Kirsch: I actually do think it's best
7:50:05 PM Beth Kirsch: u there?
8:00:48 PM samosborn415: Yeah I bet
8:00:58 PM Beth Kirsch: well
8:01:10 PM Beth Kirsch: I think in many ways this job was hurting me
8:01:19 PM Beth Kirsch: the last three months were really a disaster
8:01:35 PM samosborn415: yeah its hard to believe u leaving
8:01:54 PM Beth Kirsch: I'm really sad about it
8:02:18 PM samosborn415: 1 more week?
8:02:23 PM Beth Kirsch: yes
8:02:26 PM Beth Kirsch: and it's killing me
8:02:27 PM Beth Kirsch: lol
8:02:38 PM Beth Kirsch: you know I want to hand everything off well
8:02:41 PM Beth Kirsch: but man it's hard
8:03:13 PM Beth Kirsch: I can't believe I screwed up so much
8:05:19 PM Beth Kirsch: I still think they are chasing the wrong money
8:05:51 PM samosborn415: Yeah 3 tough months
8:06:00 PM samosborn415: Well it will be good too. U'll find something btr
8:06:04 PM Beth Kirsch: I got really depressed
8:06:10 PM Beth Kirsch: and it showed
8:06:13 PM Beth Kirsch: and working with M
8:06:16 PM Beth Kirsch: made it worse
8:06:17 PM Beth Kirsch: I think
8:06:36 PM Beth Kirsch: I also believe
8:06:40 PM Beth Kirsch: that what I want to do
8:06:43 PM Beth Kirsch: and what Like.com
8:06:48 PM Beth Kirsch: needs me to do are different
8:07:09 PM Beth Kirsch: I looked at you, Eric and Baris working together
8:07:22 PM Beth Kirsch: driving revenue and it's so cool
8:10:23 PM samosborn415: Yeah its tough to work for m. U two got too close
8:11:16 PM Beth Kirsch: yes
8:11:24 PM Beth Kirsch: but he is like that
8:11:46 PM Beth Kirsch: I messed up though
8:11:56 PM Beth Kirsch: and he pushed me to hard
8:13:41 PM samosborn415: U got too excited about being his confidant maybe
8:14:06 PM Beth Kirsch: I think a lot of things went wrong
8:14:31 PM Beth Kirsch: I think also he misunderstood a stuff that got back to
him too

```
8:14:59 PM Beth Kirsch: it was more than M
8:15:00 PM Beth Kirsch: though
8:15:06 PM Beth Kirsch: AZ has issues with me
8:15:12 PM Beth Kirsch: and some engineers
8:15:42 PM samosborn415: Too buddy buddy
8:16:00 PM samosborn415: Yep
8:17:43 PM Beth Kirsch: odd
8:17:50 PM Beth Kirsch: the whole thing
8:17:54 PM Beth Kirsch: he is a odd man
8:17:56 PM Beth Kirsch: in someways
9:02:21 PM samosborn415: After this wk ur done?
9:02:27 PM Beth Kirsch: yes
9:02:48 PM Beth Kirsch: I was trying to leave on wed
9:02:56 PM Beth Kirsch: but M wont let me go until Friday
```

# EXHIBIT C

December 15, 2007

9:21:43 PM Beth Kirsch: burak is running the a/b tests
9:22:06 PM Beth Kirsch: I was going to be stuck doing sales
9:23:00 PM samosborn415: Wow
9:23:12 PM Beth Kirsch: did you read his email
9:24:29 PM Beth Kirsch: I do think in the end this is for the best
9:24:30 PM Beth Kirsch: but man
9:24:32 PM Beth Kirsch: it's hard
9:24:52 PM Beth Kirsch: I think Munjal and I have an unhealthy relationship
9:25:03 PM Beth Kirsch: he is abusive at times
9:34:18 PM samosborn415: I had a good chat with eric and baris on friday about
a\b
9:35:27 PM Beth Kirsch: yay
9:41:13 PM samosborn415: Yeah
9:41:24 PM Beth Kirsch: I can'[t believe I'm leaving
9:41:32 PM Beth Kirsch: all this stuff I've been fighing for
9:41:38 PM Beth Kirsch: finally coming online
9:50:15 PM samosborn415: Yeah I got laid off by military.com when they were
having trouble. I
survived 3 prior rounds. But it was still hard.
9:50:33 PM Beth Kirsch: YAY
9:50:37 PM Beth Kirsch: oh
9:50:38 PM Beth Kirsch: yeah
9:50:41 PM Beth Kirsch: the issue here
9:50:52 PM Beth Kirsch: is I have given so much to this company
9:50:56 PM Beth Kirsch: I want to see it through
9:50:59 PM Beth Kirsch: but you know
9:51:06 PM Beth Kirsch: I worry abotu the exit
9:51:13 PM Beth Kirsch: here
9:51:35 PM Beth Kirsch: I feel like I let M down too
9:51:37 PM Beth Kirsch: and that hurts
9:51:43 PM Beth Kirsch: he is so angry at me
9:52:12 PM Beth Kirsch: but live and learn I guess
9:52:31 PM samosborn415: Yay?
9:52:40 PM Beth Kirsch: I meant
9:52:45 PM Beth Kirsch: yeah
9:52:50 PM Beth Kirsch: sorry
10:14:24 PM samosborn415: Well u don't need to rely on his recomendation
10:14:49 PM Beth Kirsch: he said he would give me a good one
10:48:41 PM Beth Kirsch: hey
10:48:45 PM Beth Kirsch: your sidekick
10:48:48 PM Beth Kirsch: do you like it
10:55:46 PM samosborn415: Its okay. Only good for internet tho
10:55:55 PM Beth Kirsch: Ok
10:56:05 PM Beth Kirsch: trying to deal with a new phone I like the BB i have
10:56:25 PM samosborn415: U can always have a friend check to make sure he
gives a good
reco
10:56:39 PM Beth Kirsch: I doubt he will lie
10:56:43 PM Beth Kirsch: to me about this
10:56:52 PM Beth Kirsch: he gave Ann a good recommdation and mark too
10:56:59 PM Beth Kirsch: I added more value than that
10:57:15 PM Beth Kirsch: people generally say no
10:57:26 PM Beth Kirsch: when you ask if they will be a recommedation
10:57:35 PM Beth Kirsch: if they are uncomfortable
10:57:38 PM samosborn415: Yeah u should keep bb
10:58:05 PM Beth Kirsch: people will back check me with Munjal
10:58:09 PM Beth Kirsch: if I give him or not
10:58:24 PM Beth Kirsch: I made me a rich man
10:58:25 PM Beth Kirsch: well
10:58:29 PM Beth Kirsch: he thinks that
10:58:32 PM Beth Kirsch: but you know
10:58:42 PM Beth Kirsch: I'm not super bullish on this model

```
10:58:53 PM Beth Kirsch: wanna see where smarter is getting some money from
11:01:57 PM Beth Kirsch: shopica
11:02:06 PM Beth Kirsch: toseeka
11:02:10 PM Beth Kirsch: smarter sites
11:02:18 PM Beth Kirsch: total arb
11:03:26 PM Beth Kirsch: http://www.toseeka.com/subject/Online%2BVideos
```

# EXHIBIT D

December 16, 2007

```
8:56:12 PM dldaddy: ?
8:56:29 PM Beth Kirsch: huh?
8:56:38 PM Beth Kirsch: I don't want to talk abotu this more on my work
computer
8:56:43 PM Beth Kirsch: we can talk on the hone.
8:56:48 PM Beth Kirsch: phone
8:56:55 PM Beth Kirsch: I deleted this
8:56:57 PM Beth Kirsch: chat
8:57:32 PM dldaddy: OK
9:00:08 PM Beth Kirsch: I think you should build what Riya built
9:00:11 PM Beth Kirsch: I'll tell you how
9:06:12 PM dldaddy: I'm trying to!
9:06:20 PM Beth Kirsch: Well
9:06:21 PM dldaddy: I need the product pages first
9:06:25 PM Beth Kirsch: You need three
9:06:27 PM Beth Kirsch: researchers
```

                        * * * *

```
9:09:10 PM dldaddy: Let's discuss it in January
9:09:30 PM Beth Kirsch: I thought it might be good to come visit you
9:09:38 PM Beth Kirsch: and just bat around what I learned at Riya
9:09:39 PM Beth Kirsch: for you
```

# EXHIBIT E

July 26, 2007

```
                    *  *  *  *

3:25:34 PM Beth Kirsch: we had a record day yesterday
3:25:38 PM Beth Kirsch: and you want the big news
3:25:39 PM Beth Kirsch: of the day
3:25:43 PM dldaddy: Sure
3:25:48 PM Beth Kirsch: but it's so under frienda
3:25:51 PM dldaddy: You're going to use every CSE
3:26:09 PM Beth Kirsch: I work at a company with a million dollar run rate
3:26:11 PM Beth Kirsch: shhhhh
3:26:39 PM Beth Kirsch: that's so under frienda

                    *  *  *  *
```

# EXHIBIT F

December 16, 2007

```
8:56:12 PM dldaddy: ?
8:56:29 PM Beth Kirsch: huh?
8:56:38 PM Beth Kirsch: I don't want to talk abotu this more on my work
computer
8:56:43 PM Beth Kirsch: we can talk on the hone.
8:56:48 PM Beth Kirsch: phone
8:56:55 PM Beth Kirsch: I deleted this
8:56:57 PM Beth Kirsch: chat
8:57:32 PM dldaddy: OK
9:00:08 PM Beth Kirsch: I think you should build what Riya built
9:00:11 PM Beth Kirsch: I'll tell you how
9:06:12 PM dldaddy: I'm trying to!
9:06:20 PM Beth Kirsch: Well
9:06:21 PM dldaddy: I need the product pages first
9:06:25 PM Beth Kirsch: You need three
9:06:27 PM Beth Kirsch: researchers
```

                        * * * *

```
9:09:10 PM dldaddy: Let's discuss it in January
9:09:30 PM Beth Kirsch: I thought it might be good to come visit you
9:09:38 PM Beth Kirsch: and just bat around what I learned at Riya
9:09:39 PM Beth Kirsch: for you
```

# EXHIBIT G

December 16, 2007

```
8:56:12 PM dldaddy: ?
8:56:29 PM Beth Kirsch: huh?
8:56:38 PM Beth Kirsch: I don't want to talk abotu this more on my work
computer
8:56:43 PM Beth Kirsch: we can talk on the hone.
8:56:48 PM Beth Kirsch: phone
8:56:55 PM Beth Kirsch: I deleted this
8:56:57 PM Beth Kirsch: chat
8:57:32 PM dldaddy: OK
9:00:08 PM Beth Kirsch: I think you should build what Riya built
9:00:11 PM Beth Kirsch: I'll tell you how
9:06:12 PM dldaddy: I'm trying to!
9:06:20 PM Beth Kirsch: Well
9:06:21 PM dldaddy: I need the product pages first
9:06:25 PM Beth Kirsch: You need three
9:06:27 PM Beth Kirsch: researchers
```

                        * * * *

```
9:09:10 PM dldaddy: Let's discuss it in January
9:09:30 PM Beth Kirsch: I thought it might be good to come visit you
9:09:38 PM Beth Kirsch: and just bat around what I learned at Riya
9:09:39 PM Beth Kirsch: for you
```

# EXHIBIT H

December 20, 2007

11:42:13 AM dldaddy: Just so you know, you are not allowed to say ANYTHING negative
about your next job for 12-18 months
11:42:15 AM dldaddy: PERIOD
11:42:19 AM dldaddy: No exceptions
11:42:52 AM Beth Kirsch: :)
11:42:53 AM Beth Kirsch: k
11:43:20 AM Beth Kirsch: stealing software from Riya