1    ERIC J. AMDURSKY (S.B. #180288)
      LORI E. ROMLEY (S.B. #148447)
2    JUSTIN D. WALKER (S.B. #252268)
      O'MELVENY & MYERS LLP
3    2765 Sand Hill Road
      Menlo Park, California 94025
4    Telephone: (650) 473-2600
      Fax: (650) 473-2601
5    Email: eamdursky@omm.com
           lromley@omm.com
6           jwalker@omm.com

7    Attorneys for Plaintiff
      RIYA, INC.

8

ORIGINAL FILED

JAN 2 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9             **UNITED STATES DISTRICT COURT**

10           **NORTHERN DISTRICT OF CALIFORNIA**    **MMC**

11                **SAN FRANCISCO DIVISION**

12            CV 08      0547

13    RIYA, INC., a California Corporation      Case No. _____

14            Plaintiff,        **DECLARATION OF MUNJAL SHAH IN**
                                       **SUPPORT OF PLAINTIFF RIYA, INC.'S**
15         v.                    **EX PARTE APPLICATION FOR**
                                       **TEMPORARY RESTRAINING ORDER**
16    DEBORAH BETH KIRSCH,         **AND ORDER TO SHOW CAUSE RE:**
                                       **PRELIMINARY INJUNCTION**
17            Defendant.

18

19

20

21

22

23

24

25

26

27

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

# DECLARATION OF MUNJAL SHAH

I, Munjal Shah, declare as follows:

1.    If called to testify as a witness in this matter, I could and would testify competently to the following facts that are within my personal knowledge.

## I.    RIYA AND ITS PRODUCT.

2.    I am the Chief Executive Officer and Co-Founder of Riya, Inc. ("Riya"). I have held this position since Riya's inception in August 2004.

3.    Riya is a California corporation, with its headquarters in San Mateo, California. Riya is a small privately-held company that was founded on August 6, 2004, and currently has 23 employees in the United States, along with two employees in India.

4.    Riya's prized website, Like.com, offers customers the opportunity to shop through a visual search engine. Like.com is the first true visual search engine on the market today. Shoppers are able to log onto Like.com and click on pictures of products that they like. The search engine uses Riya's proprietary Likeness Technology™ (which searches by image instead of text), Like Detail™ (which searches by specific features, such as a buckle, heel or watch bezel) and Like Color™ (which searches by color variants in the items chosen by the customer) to search for other items that are similar, which the consumer might want to purchase. That specialized and unique technology creates a digital signature that describes the photo's contents and enables a more accurate search for similar looking items and products. Riya generates revenue through Like.com by sending leads to the merchants who sign up with the site and pay on a "click through" basis. Once a consumer clicks on a product to purchase, Riya's powerful search engine clicks the consumer through to the merchant's website.

5.    Riya's product has been immensely successful. Riya attributes this success to its source code that contains unique and proprietary algorithms. I am unaware of any other company that uses the same algorithms that Like.com uses, which permit Like.com consumers to quickly and reliably click through to the merchant's website.

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

SHAH DECLARATION ISO OF
APPLICATION FOR TRO

## II.    KIRSCH'S EMPLOYMENT WITH RIYA

6.    On September 13, 2006, Riya hired Kirsch as the Director of Marketing, and later she held the position of Vice President of Marketing and Sales. She was a member of Riya's Executive Staff and regularly attended the company's board of director meetings. Prior to those meetings, Kirsch received board packages, which contained highly confidential and proprietary business information. Kirsch also received daily financial reports generated by the company. Kirsch was also deeply involved with Riya's core trade secrets with respect to its marketing and distribution plans and strategies. Further, Kirsch spent a great deal of time assisting the engineering staff while they worked on the core trade secrets of the search engine, including the proprietary algorithms. In her executive position, Kirsch was privy to Riya's confidential, proprietary and trade secret information and had access to virtually all of Riya's carefully guarded information and trade secrets.

7.    When Kirsch was hired, she signed the Company's Proprietary Information and Inventions Assignment Agreement ("PIIA"). (A true and correct copy of the PIIA is attached hereto as **Exhibit A**.) The PIIA states that it is "a material part of the consideration" for Kirsch's employment or continued employment and that it is effective as of her first date of employment. *Id.* at p. 1. The PIIA contains the following provisions, among others:

> "Proprietary Information" includes, without limitation, information (whether conveyed orally or in writing) about algorithms, application programming interfaces, protocols, trade secrets, computer software, designs, technology, ideas, know-how, products, services, processes, data, techniques, improvements, inventions (whether patentable or not), works of authorship, business and product development plans, the salaries and terms of compensation of other employees, customer lists and other information concerning the Company's actual or anticipated business, research or development, or that is received in confidence by or for the Company from any other person. I understand that my employment creates a relationship of confidence and trust between me and the Company with respect to Proprietary Information.

Ex. A § 1.

> "Company Materials" are documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of the Company, whether such documents have been prepared by me or by others. . . . [and] include[s], without limitation, blueprints,

- 3 -

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1    drawings, photographs, charts, graphs, notebooks, customer lists,
     computer software, media or printouts, sound recordings and other
2    printed, typewritten or handwritten documents, as well as samples,
     prototypes, models, products and the like.

3

4    Ex. A § 2.

5    At all times, both during my employment with the Company and
     after its termination, I will keep in confidence and trust and will not
6    use or disclose any Proprietary Information or anything relating to
     it without the prior written consent of an officer of the Company
7    except as may be necessary and appropriate in the ordinary course
     of performing my duties to the Company.

8

9    Ex. A § 3.1.

10   All Company Materials shall be the sole property of the Company.
     I agree that during my employment with the Company, I will not
11   remove any Company Materials from the business premises of the
     Company or deliver any Company Materials to any person or entity
12   outside the Company, except as I am required to do in connection
     with performing the duties of my employment.

13

14   Ex. A § 3.2.

15   I agree that during my employment with the Company, I will not
     engage in any employment, business, or activity that is in any way
16   competitive with the business or proposed business of the
     Company, and I will not assist any other person or organization in
17   competing with the Company or in preparing to engage in
     competition with the business or proposed business of the
18   Company. The provisions of this paragraph shall apply both during
     normal working hours and at all other times including, without
19   limitation, nights, weekends and vacation time, while I am
     employed with the Company.

20

21   Ex. A § 5.

22   I agree that my obligations under Sections 3.1 through 3.8, Section
     4 and Section 9 of this Agreement shall continue in effect after
23   termination of my employment, regardless of the reason or reasons
     for termination, and whether such termination is voluntary or
24   involuntary on my part, and that the Company is entitled to
     communicate my obligations under this Agreement to any future
25   employer or potential employer of mine.

26   Ex. A § 10.

27   Because my services are personal and unique and because I may
     have access to and become acquainted with the Proprietary
28   Information of the Company, the Company shall have the right to

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

SHAH DECLARATION ISO OF
APPLICATION FOR TRO

1                enforce this Agreement and any of its provisions by injunction,
specific performance or other equitable relief, without bond,

2                without prejudice to any other rights and remedies that the
Company may have for a breach of this Agreement.

3

4   Ex. A § 13.

5                I HAVE READ THIS AGREEMENT CAREFULLY AND I
UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT

6                IMPOSES UPON ME WITHOUT RESERVATION. NO
PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO

7                ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN
THIS AGREEMENT VOLUNTARILY AND FREELY, IN

8                DUPLICATE, WITH THE UNDERSTANDING THAT ONE
COUNTERPART WILL BE RETAINED BY THE COMPANY

9                AND THE OTHER COUNTERPART WILL BE RETAINED BY
ME .

10   Ex. A at p. 5.

11       8.    Tri-Net is a third party that administers Riya's benefits. When an employee is

12 hired, he or she must complete an online registration with Tri-Net. To finalize the registration,

13 the employee must accept a copy of Riya's Employee Handbook electronically. When Kirsch

14 was hired, she registered with Tri-Net and I am informed and believe and thereon allege that

15 Kirsch accepted her copy of the Employee Handbook. The Employee Handbook sets forth Riya's

16 ethical standards, including "[t]o protect confidential information," and it explains that

17 misconduct includes, "[d]amaging, destroying, removing without authority, or failing to return,

18 any property (physical or intellectual) belonging to the company."

19       9.    The Employee Handbook also states:

20                As an employee, you may learn information about the company that
is not known by the general public. This information may include

21                trade secrets, business plans, financial results, marketing and sales
plans, or acquisition or disposition of company assets. Regardless

22                of whether this type of information is specifically classified as
confidential, it is each employee's responsibility to keep this

23                information in confidence. All items such as manuals, reports,
records and statements, other than those made available to the

24                general public, are the property of the company, generally to be
kept at the company's place of business and are to be returned to

25                the company when requested and upon termination.

26      10.    Riya employees are expressly forbidden in the Employee Handbook from: "Using

27 information developed or learned on the job for personal or familial benefit. This includes the use

28 of company databases, financial information, and intellectual property" and from "Sharing

- 5 -

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

1  confidential or proprietary company related information with business associates or

2  representatives of other companies."

3       11.    Riya's Employee Handbook  further states that:

4            To jeopardize the security of restricted information is detrimental to
             company and employee security.  We need all employees to do
5            their part in protecting such information by not disclosing any trade
             secrets or confidential information or using it in any manner that is
6            unauthorized or detrimental to the best interests of the company.
             Some employees who have access to confidential, sensitive, or
7            proprietary information about the company or its clients, processes,
             and employees may also need to sign a Proprietary Information and
8            Inventions Agreement (PIIA) as a condition of employment.
             Employees who disclose trade secrets or confidential company
9            information may be subject to disciplinary action, up to and
             including discharge.
10

11      12.    Riya's employees are also told in the Employee Handbook that: "All business

12  equipment, electronic and telephone communications systems, and all communications and stored

13  information transmitted, received, or contained in the company's information systems are the

14  company's property and are to be used for job-related purposes unless otherwise authorized by

15  the company."

16      13.    Finally, the Employee Handbook demands that: "If you leave our employ, you will

17  need to return any company property in your possession."  A true and correct copy of the

18  passages of the Employee Handbook cited herein are attached hereto as **Exhibit B**.  Riya was

19  formerly known as Ojos, Inc.

20  **III.    KIRSCH'S TERMINATION**

21      14.    Kirsch was terminated for cause from employment with Riya on or about

22  December 11, 2007.  At that time, I had learned that Kirsch had breached her duties of

23  confidentiality and had disclosed confidential management materials to a non-managerial

24  employee.  I told Kirsch that she was being terminated for this breach of confidentiality and for

25  non-performance.  Kirsch never denied the accusation that she had breached her confidentiality

26  obligations.

27      15.    I told Kirsch that she could remain employed by the company until December 31,

28  2007, but her last actual day in the Riya office was December 21.  When she departed, she left her

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

SHAH DECLARATION ISO OF
APPLICATION FOR TRO

1  company laptop computer at Riya. Kirsch's computer was locked up in the employee vault from

2  the day she left until I took it out on January 11, 2008.

3  **IV.    DISCOVERY OF KIRSCH'S THEFT OF TRADE SECRETS**

4      16.    On or about January 11, 2008, I opened Kirsch's company laptop computer in

5  order to locate a particular Insertion Order that had been submitted by a customer merchant.

6  When I opened the computer, an instant message ("IM") between Kirsch and "dldaddy," who is

7  David Lewis, popped up on the screen. I believe that Kirsch must have left the message open or

8  her computer automatically logged into that message at start up. My understanding is that David

9  Lewis is the President and Founder of 77blue.com, LLC which operates shopping portals

10  including cashbaq.com and anycoupons.com. Both of these websites compete against Riya.

11      17.    The IM that I saw was racially derogatory, with Kirsch calling Riya employees a

12  bunch of "freakin' indian engineers." I became concerned about what else might be on her

13  computer, so I reviewed her IMs. I spent at least 20 hours searching through these

14  communications, as there were thousands of IMs. I was shocked by what I found.

15      18.    There were IMs in which Kirsch volunteered to share Riya's confidential,

16  proprietary and trade secret information with a competitor. For example, in one IM Kirsch told

17  Riya's competitor that it should build what Riya built -- going so far as to offer her services to

18  help it do so. She also made plans to get together with Lewis to discuss "what [she] learned at

19  Riya." A true and correct copy of that IM is attached to the Romley Decl. as **Exhibit F.**

20      19.    In another IM, Kirsch stated that she stole software from Riya. A true and correct

21  copy of that IM is attached to the Romley Decl. as **Exhibit H.** Kirsch also disclosed confidential

22  and proprietary financial information to Lewis, including the "run rate" for Riya (a true and

23  correct copy of that IM is attached to the Romley Decl. as **Exhibit E**). Further, in another IM

24  sent on November 26, 2007, Kirsch disclosed to Lewis the details of the deal that Riya was

25  negotiating with a Partner. Kirsch revealed to Lewis the name of the Partner, the percentages of

26  revenue sharing that were being discussed between Riya and the Partner, and the other terms that

27  Riya was seeking to include in the deal. Both the terms of the deal and the financial information

28  are considered by Riya to be confidential and proprietary information that should not be disclosed

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 7 -

SHAH DECLARATION ISO OF
APPLICATION FOR TRO

1    outside the company, let alone to a company that competes with Riya in the marketplace. This

2    information in the hands of a competitor can put Riya at a competitive disadvantage, or out of

3    business all together.

4        20.    On January 15, 2008, I called Kirsch to discuss what I had found on her computer,

5    and to advise her that because Riya would be filing suit against her, she needed to retain all her

6    emails and IMs for purposes of the litigation. She did not answer the telephone, so I left a

7    message and sent her a follow up email. (A true and correct copy of that email is attached hereto

8    as **Exhibit C.**) Kirsch never returned my telephone call and she did not respond to my email.

9    **V.    RIYA'S EFFORTS TO MAINTAIN THE SECRECY OF ITS INFORMATION**

10        21.    Due to the nature of Riya's business, Riya must protect the secrecy of its many

11    valuable trade secrets and other confidential and proprietary materials in its possession. In

12    particular, Riya goes to great lengths to protect its electronic information and the security of its

13    computer networks from unauthorized access and/or distribution, including the trade secret

14    materials and confidential communications on its computer networks and shared between its

15    personnel.

16        22.    When hired by Riya, employees are required to sign the PIIA, in which the

17    employee agrees to keep confidential all of Riya's confidential and proprietary business and trade

18    secret information. This proprietary information is only disclosed outside of Riya when

19    necessary, and then only pursuant to strict non-disclosure agreements. Further employees are

20    given a copy of the Employee Handbook that similarly requires them to keep Riya's confidential

21    information confidential and it specifically precludes employees from disclosing that information

22    to a representative of another company.

23        23.    Access to Riya's office in San Mateo is permitted only with a key code or key.

24    Cornerstone Properties, the company that owns the building and premises where Riya is located,

25    provides physical security for the office.

26        24.    All of Riya's core trade secrets, including but not limited to the algorithms, source

27    code, and source code control are located in a secure data center. To gain access to the data

28    center, an employee must have a swipe card, pass a fingerprint identification and then once

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

- 8 -

SHAH DECLARATION ISO OF
APPLICATION FOR TRO

1    inside, have a special key to gain access to the metal cage wherein the algorithms, source code,

2    source code control and other trade secrets are kept.  Kirsch had access to such information once

3    she was behind the Riya firewall, through email and the Wiki, which is essentially an online

4    database.

5        25.    Riya's electronic communications and data are protected from unauthorized third

6    party access (*i.e.*, hacking) by a firewall that prevents unauthorized inbound internet traffic from

7    reaching Riya's computer networks.

8        26.    Through the PIIA and the Employee Handbook, all Riya employees are expressly

9    prohibited from removing company material from the office and are required to return all

10    Company Materials (as defined in the PIIA) upon the termination of their employment.

11        27.    Riya's confidential and proprietary business and trade secret information comprise

12    documents and information that are not generally known to the public or to other persons who can

13    obtain economic value from its disclosure or use.

14        28.    Kirsch did not have consent to steal, use or disclose Riya's confidential and

15    proprietary business and trade secret information outside of Riya, especially not for the benefit of

16    Riya's competitors.

17        29.    Riya will be harmed by Kirsch if she continues to use or disclose Riya's

18    confidential and proprietary business and trade secret information.  The amount of this harm is

19    difficult to ascertain.  Disclosure of Riya's product may allow other businesses to gain a

20    competitive advantage that they would not otherwise be entitled to obtain, which will

21    detrimentally affect Riya's place in the market and its market share.  Critically, if another

22    company gains access to Riya's source code and algorithms, Riya will lose its status as the only

23    company to use these unique trade secrets.  If that happens, I estimate that the value of the

24    company will decrease in an amount up to $10-$20 million, which means that if acquired, Riya

25    will realize significantly less than it otherwise would have and will be unable to reap the rewards

26

27

28

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

SHAH DECLARATION ISO OF
APPLICATION FOR TRO

1  of its efforts. Finally, disclosures of Riya's confidential and proprietary business and trade secret

2  information may force Riya out of the market.

3        I declare under penalty of perjury under the laws of the United States of America

4  that the foregoing is true and correct.

5        Executed this 24th day of January 2008, at San Mateo, California.

6

7                      Munjal Shah

8

9  MP1:1012391.3

10

11

O'MELVENY & MYERS LLP
ATTORNEYS AT LAW
MENLO PARK

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                    SHAH DECLARATION ISO OF
                    APPLICATION FOR TRO

# EXHIBIT A

# EMPLOYEE
## PROPRIETARY INFORMATION
### AND INVENTIONS AGREEMENT

The following confirms an agreement between me and Riya, Inc., a California corporation (the "Company"), which is a material part of the consideration for my employment or continued employment with the Company, and which is effective as of the date my employment with the Company commenced:

1.    Proprietary Information. I understand that the Company possesses and will possess Proprietary Information that is important to its business. For purposes of this Agreement, "Proprietary Information" is information that was or will be developed, created, or discovered by or on behalf of the Company, or that became or will become known by, or was or is conveyed to the Company, that has commercial value in the Company's business. "Proprietary Information" includes, without limitation, information (whether conveyed orally or in writing) about algorithms, application programming interfaces, protocols, trade secrets, computer software, designs, technology, ideas, know-how, products, services, processes, data, techniques, improvements, inventions (whether patentable or not), works of authorship, business and product development plans, the salaries and terms of compensation of other employees, customer lists and other information concerning the Company's actual or anticipated business, research or development, or that is received in confidence by or for the Company from any other person. I understand that my employment creates a relationship of confidence and trust between me and the Company with respect to Proprietary Information.

2.    Company Materials. I understand that the Company possesses or will possess "Company Materials" that are important to its business. For purposes of this Agreement, "Company Materials" are documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of the Company, whether such documents have been prepared by me or by others. "Company Materials" include, without limitation, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists, computer software, media or printouts, sound recordings and other printed, typewritten or handwritten documents, as well as samples, prototypes, models, products and the like.

3.    Intellectual Property. In consideration of my employment with the Company and the compensation received by me from the Company from time to time, I hereby agree as follows:

3.1    All Proprietary Information and all right title and interest in and to patents, patent rights, copyright rights, mask work rights, trade secret rights, and other intellectual property and proprietary rights anywhere in the world (collectively "Rights") in connection therewith shall be the sole property of the Company. I hereby assign to the Company any Rights I may have or acquire in such Proprietary Information. At all times, both during my employment with the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company except as may be necessary and appropriate in the ordinary course of performing my duties to the Company.

MP1:958596.2

3.2     All Company Materials shall be the sole property of the Company. I agree that during my employment with the Company, I will not remove any Company Materials from the business premises of the Company or deliver any Company Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment. I further agree that, immediately upon the termination of my employment by me or by the Company for any reason, or for no reason, or during my employment if so requested by the Company, I will return all Company Materials, apparatus, equipment and other physical property, or any reproduction of such property, excepting only (i) my personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copy of this Agreement.

3.3     I understand, in addition, that the Company has received and in the future will receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not .disclose (to anyone other than Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

3.4     I will promptly disclose in writing to my immediate supervisor or to any persons designated by the Company, all "Inventions" (which term includes improvements, inventions (whether or not patentable), works of authorship, trade secrets, technology, algorithms, computer software, protocols, formulas, compositions, ideas, designs, processes, techniques, know-how and data) made or conceived or reduced to practice or developed by me (in whole or in part, either alone or jointly with others) during the term of my employment. I will also disclose to the Company, Inventions conceived, reduced to practice, or developed by me within six months of the termination of my employment with the Company; such disclosures shall be received by the Company in confidence, to the extent they are not assigned in Section 3.5 below, and do not extend such assignment. I will not disclose Inventions covered by Section 3.5 to any person outside the Company unless I am requested to do so by management personnel of the Company.

3.5     I agree that all Inventions that I make, conceive, reduce to practice or develop (in whole or in part, either alone or jointly with others) during my employment shall be the sole property of the Company to the maximum extent permitted by Section 2870 of the California Labor Code, a copy of which is attached and I hereby assign such Inventions and all Rights therein to the Company. No assignment in this Agreement shall extend to inventions, the assignment of which is prohibited by Labor Code Section 2870. The Company shall be the sole owner of all Rights in connection therewith.

3.6     I acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of my employment and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. Section 101).

3.7    I agree to perform, during and after my employment, all acts deemed necessary or desirable by the Company to permit and assist it, at the Company's expense, in evidencing, perfecting, obtaining, maintaining, defending and enforcing Rights and/or my assignment with respect to such Inventions in any and all countries. Such acts may include, without limitation, execution of documents and assistance or cooperation in legal proceedings. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorneys-in-fact, with full power of substitution, to act for and in my behalf and instead of me, to execute and file any documents and to do all other lawfully permitted acts to further the above purposes with the same legal force and effect as if executed by me.

3.8    Any assignment of copyright hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights"). To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent. I will confirm any such waivers and consents from time to time as requested by the Company.

3.9    I have attached hereto a complete list of all existing Inventions to which I claim ownership as of the date of this Agreement and that I desire to specifically clarify are not subject to this Agreement, and I acknowledge and agree that such list is complete. If no such list is attached to this Agreement, I represent that I have no such Inventions at the time of signing this Agreement.

4.    Non-Solicitation.  During the term of my employment and for one year thereafter, I will not encourage or solicit any employee or consultant of the Company to leave the Company for any reason. However, this obligation shall not affect any responsibility I may have as an employee of the Company with respect to the bona fide hiring and firing of Company personnel.

5.    Non-Competition.  I agree that during my employment with the Company, I will not engage in any employment, business, or activity that is in any way competitive with the business or proposed business of the Company, and I will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company. The provisions of this paragraph shall apply both during normal working hours and at all other times including, without limitation, nights, weekends and vacation time, while I am employed with the Company.

6.    No Conflict with Obligation to Third Parties.  During my employment by the Company, I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust

prior to my employment with the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith or in conflict with my employment with the Company.

       7.     <u>At-Will Employment</u>. I agree that this Agreement is not an employment contract and that I have the right to resign and the Company has the right to terminate my employment at any time, for any reason, with or without cause.

       8.     <u>Other Employee Obligations</u>. I agree that this Agreement does not purport to set forth all of the terms and conditions of my employment, and that as an employee of the Company I have obligations to the Company that are not set forth in this Agreement.

       9.     <u>Arbitration</u>. We agree to arbitrate before a neutral arbitrator any and all disputes arising from or relating to Employee's recruitment or employment with the Company, or the termination of that employment, including claims against any current or former agent or employee of the Company, whether arising under a tort, contract, statute, regulation, or ordinance now in existence or which may in the future be enacted or recognized, including without limitation claims for employment discrimination under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the California Fair Employment and Housing Act, the Employee Retirement Income Securities Act, the Racketeer Influenced and Corrupt Practices Act, or any other federal, state or local law or regulation now in existence or hereinafter enacted and as amended from time to time concerning any part of the employment relationship, except: (a) claims for benefits under the unemployment insurance or workers' compensation laws, which will be resolved pursuant to those laws; (b) claims concerning the validity, infringement or enforceability of patent rights, copyright, trademark, license or any other intellectual property rights; (c) claims concerning the validity or misuse of trade secrets; (d) claims concerning the validity, enforceability or breach of the Proprietary Information and Inventions Agreement to which the Employee and the Company are signatory; and (e) any other dispute or claim that has been expressly excluded from arbitration by statute ("Arbitrable Claim"). Also, nothing in this Agreement prohibits the filing of a charge or complaint with a federal, state, or local administrative agency charged with overseeing any applicable federal, state or municipal law or regulation. Any Arbitrable Claim that is not resolved through the federal, state, or local agency must be submitted to arbitration in accordance with this Agreement. Binding arbitration will be conducted in Santa Clara County, or in any county in which the venue would have been proper if the Employee were free to bring the dispute(s) or claim(s) in court. Binding arbitration will be conducted in accordance with the rules and regulations of the American Arbitration Association (AAA) then in effect. We agree that the Company will bear the arbitrator's fee, any other type of expense or cost the employee would not be required to bear if he or she were free to bring the dispute or claim into court, and any cost otherwise required by California law. We understand and agree that, by signing this Agreement, we are expressly waiving any and all rights to a trial before a court or jury or before a government agency regarding any Arbitrable Claim.

       10.    <u>Survival</u>. I agree that my obligations under Sections 3.1 through 3.8, Section 4, and Section 9 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is

4

voluntary or involuntary on my part, and that the Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine.

11.    Controlling Law; Severability.  I agree that any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of California without regard to the conflict of laws provisions thereof.  I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable California law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms.

12.    Successors and Assigns.  This Agreement shall be effective as of the date I execute this Agreement and shall be binding upon me, my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

13.    Legal and Equitable Remedies.  Because my services are personal and unique and because I may have access to and become acquainted with the Proprietary Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond, without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

14.    Modification.  This Agreement can only be modified by a subsequent written agreement executed by an officer of the Company.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT ONE COUNTERPART WILL BE RETAINED BY THE COMPANY AND THE OTHER COUNTERPART WILL BE RETAINED BY ME. I UNDERSTAND THAT WE ARE WAIVING ALL RIGHTS TO A TRIAL OR HEARING BEFORE A COURT OR JURY OR GOVERNMENT AGENCY AS TO ANY ARBITRABLE CLAIM.

_____
Employee Signature

Name of employee: Deborah Beth Kirsch

Date: 9/14, 2006

MPI:958596.2                                    5

Accepted and Agreed to:

RIYA, INC.

By: _____

Name:   MUNJAL SHAH

Title:     CEO

## ATTACHMENT A

Gentlemen:

     1.    The following is a complete list of Inventions relevant to the subject matter of my employment with Riya , Inc. (the "Company") that have been made, conceived, developed or first reduced to practice by me (in whole or in part, either alone or jointly with others) prior to my employment by the Company that I desire to clarify are not subject to the Company's Employee Proprietary Information and Inventions Agreement.

☐    No Inventions

☐    See below:

☐    Additional sheets attached

     2.    I propose to bring to my employment the following materials and documents of a former employer:

☐    No materials or documents

☐    See below:

Employee Signature

Name of employee: D. Beth Hirsh

MP1:958596.2

## ATTACHMENT B

Section 2870. Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

MP1:958596.2

# EXHIBIT B

# Employee Handbook





© 2006, TriNet Group, Inc.
All Rights Reserved.

# Chapter Two: General Employment Conduct

We are committed to the highest standards of conduct at every level, and we depend upon the personal and professional integrity and dedication of all employees to help uphold these standards. Your honorable character and helpful behavior are assets and a credit to the company. In the same vein, we will not tolerate conduct that interferes with company operations, discredits the company, is illegal or is offensive to customers or fellow employees. To help maintain a positive work environment for you and your co-workers, we rely on you to behave according to the provisions set forth in this chapter, elsewhere in this handbook, and in other company policy and directives. Failure to comply with these guidelines may result in disciplinary action, up to and including termination. This section is not intended to include every situation that might arise, nor does it affect the at-will employment policy described in this handbook.

## At-Will Employment

As an employee, you have the right to terminate your employment at any time, with or without advance notice, for any or no reason. Similarly, we have the option of ending your employment with us at any time, with or without cause or prior notice. The terms and conditions of employment including, but not limited to, demotion, promotion, transfer, compensation, benefits, duties, and location of work, may also be changed at any time, with or without cause or prior notice.

This is called at-will employment, and nothing in this handbook or any other statement, written or verbal, has the power to alter it.  Only a written agreement signed by your company president can change at-will employment.

## Expectations and Restrictions

The following expectations apply to all employees at all work locations:

- Take good care of any company information or equipment assigned to you.
- Avoid conflicts of interest, including other employment or other outside activities that could interfere with your duties or assignments with the company. Please inform your manager or TriNet of any possible conflicts.
- Report any work-related illness or injury to TriNet's Solution Center (800.638.0461, M-F 6 a.m.-6 p.m., Pacific Time, 9 a.m.-9 p.m. Eastern Time) within 24 hours, and let your manager or TriNet know about any unsafe work conditions or damaged equipment as soon as possible.

Examples of misconduct include, but are not limited to, the following:

- Refusing to accept legitimate work assignments
- Refusing to follow your manager's instructions or directions or other insubordinate conduct
- Conducting personal business, including outside employment, on company time or with company equipment, supplies, or other materials
- Possessing or using weapons, liquor, or illicit drugs in the workplace
- Sleeping or being under the influence of alcohol, drugs, or intoxicants while on company time
- Lying or falsifying information, including time reports
- Damaging, destroying, removing without authority, or failing to return, any property (physical or intellectual) belonging to the company, TriNet, or another employee
- Fighting, horseplay, practical jokes, or other disorderly conduct that could endanger or disturb any employee or visitor on company premises or time
- Interfering with the performance and/or business of other employees or visitors
- Threatening, intimidating, or coercing any employee or visitor, including the use of abusive or vulgar language

- Engaging in conduct or illegal activities that pose a health or safety hazard, including smoking in no smoking areas
- Adversely affecting an employee's work, his or her relationship with fellow employees, or the company's products, property, reputation, or goodwill in the community
- Soliciting or accepting gratuities from customers or vendors
- Holding unauthorized gatherings on work premises or admitting unauthorized persons into the work place
- Any conduct that reflects adversely on the company, other employees, or TriNet

## Code of Business Ethics and Conduct

Just as the company has a responsibility to conduct its business in strict compliance with all applicable laws and regulations, so too it expects its employees to act in accordance with the highest standards of business ethics both on and off company premises, and to avoid any appearance of impropriety. It is crucial that you observe all applicable laws and regulations while conducting business on the company's behalf.

You are expected to abide by the spirit as well as the letter of this policy. You are also expected to cooperate with any inquiries or investigations concerning a possible or suspected violation of this policy. Accordingly, an employee's failure to fulfill his or her responsibilities under this policy may result in disciplinary action, up to and possibly including immediate termination.

### Ethical Standards

Your company is committed to conducting business in a fair and open manner within the spirit and letter of the law, with the highest regard for customers, the community, and employees. The success of the company depends not only on the knowledge, skills and abilities of employees, but also on sound judgment, self-discipline, common sense, and integrity. As such, all employees are required to maintain and uphold the following common ethical standards:

- To pursue company objectives in a manner that does not conflict with the integrity of the company or the public interest;
- To be truthful and accurate in all you say and do;
- To protect confidential information;
- To treat fellow employees with respect and dignity;
- To uphold all laws and regulations relating to the business;
- To maintain honest and fair relationships with all of the company's vendors;
- To ensure quality and value in the company's products/services and relationships with customers and vendors.
- It is company policy to comply fully with all laws, ordinances, rules, and regulations applicable to the operation of the company's business, and to avoid, in the course of the operation of the company, any situations that may engender any conflict between the personal interests of employees and the business interests of the company.

### Conflicts of Interest

The company insists on the undivided loyalty of all employees, including management and non-management staff. Employees must not engage in any conduct that would create an actual or potential conflict of interest or create the appearance of such a conflict. All employees are expected to avoid situations that create an actual or potential conflict in which an employee's actions or loyalties are divided between company interests and those of another.

Conflicts of interest arise when an employee engages in a personal activity or has a personal interest that depends upon a specific outcome in the business of the company. These personal activities or interests may influence the employee's judgment, causing the employee to make decisions based upon the potential for personal gain, rather than in the best interests of the company.

To prevent possible conflicts of interest, the following behavior is deemed unacceptable and unethical:

- Receiving or giving of merchandise, money, services, travel, accommodations, or lavish entertainment that might appear to have been given to influence a business decision. Gifts offered or received at any time that are of more than minimal or token value shall not be accepted and shall be returned to the sender with an appropriate explanatory note or letter.
- Maintaining personal, business, or financial relationships with a customer or vendor where the employee has control or influence over the company's relationship with that customer or vendor. For example, employees should not borrow from or lend personal funds to a customer or vendor of the employee's division.
- Using information developed or learned on the job for personal or familial benefit. This includes the use of company databases, financial information, and intellectual property.
- Maintaining outside directorship, employment, or political office that might appear to conflict or compete with an employee's responsibilities.
- Conducting company business with or using position or authority to influence the company to conduct business with family members.
- Sharing confidential or proprietary company related information with business associates or representatives of other companies.

The list above serves only to illustrate sources of possible conflicts of interest and does not constitute a complete list of all the situations that may result in a conflict of interest. Ultimately, it is the responsibility of each employee to avoid any situation that could affect his/her ability to judge situations independently and objectively or even appear to be a conflict of interest. It is important to note that under certain circumstances, conflicts of interest can amount to violations of criminal law. Any doubts should be resolved in a discussion with your manager, TriNet Human Resources staff, or the company's legal counsel.

### Employment of Relatives and Significant Others.

To avoid conflicts of interest and promote stability and goodwill in the workplace, we don't usually hire or transfer relatives into positions where they supervise or are supervised by another close family member. We also try to avoid placing them in positions where they work with or have access to sensitive information about family members. The same general considerations apply if two employees marry or become involved in a domestic-partner relationship. If a supervisory, security, morale, safety, or other conflict results from the relationship, we reserve the right to use our discretion in hiring and placing employees in a manner designed to avoid these concerns. One of the employees may be transferred—or if necessary terminated—to resolve the situation.

By relatives we mean your spouse, parents, legal guardians, siblings, children (natural, step-, or adopted), grandparents, grandchildren, or current in-laws. This policy also applies to significant others or domestic partners. There may be other considerations or restrictions based on job requirements and situations specific to your company. Check with your manager for clarification.

### Confidential Information

As an employee, you may learn information about the company that is not known by the general public. This information may include trade secrets, business plans, financial results, marketing and sales plans, or acquisition or disposition of company assets. Regardless of whether this type of information is specifically classified as confidential, it is each employee's responsibility to keep this information in confidence. All items such as manuals, reports, records and statements, other than those made available to the general public, are the property of the company, generally to be kept at the company's place of business, and are to be returned to the company when requested and upon termination.

### Recognizing & Reporting a Conflict

We expect employees to be familiar with this Code of Business Ethics and Conduct and to comply with it. Employees are also expected to rely on their own high standards of judgment, and to seek the advice and counsel of management or TriNet Human Resources staff to clarify issues not covered by these guidelines or by good judgment.

- All business equipment, electronic and telephone communications systems, and all communications and stored information transmitted, received, or contained in the company's information systems are the company's property and are to be used for job-related purposes unless otherwise authorized by the company.
- Employees are not to download or otherwise import programs, files or documents into the company's computer equipment except as authorized by the company.
- The company may monitor use of any systems and equipment to ensure proper usage, including compliance with software licensing, copyright and illegal usage laws.
- The Employee in whose name an account is issued by the company is responsible for its proper use at all times.
- The company reserves the right to determine the appropriate use of electronic media and services and its decision will be final.
- Employees who violate this or any other company policy related to electronic media are subject to discipline, up to and including termination of employment.
- The company assumes no liability for loss, damage, disclosure or misuse of any non-company data or communications transmitted or stored on the company's computer equipment.

Please contact your manager for more specific information on your company's electronic media policies.

### Confidential Information

To jeopardize the security of restricted information is detrimental to company and employee security. We need all employees to do their part in protecting such information by not disclosing any trade secrets or confidential information or using it in any manner that is unauthorized or detrimental to the best interests of the company. Some employees who have access to confidential, sensitive, or proprietary information about the company or its clients, processes, and employees may also need to sign a Proprietary Information and Inventions Agreement (PIIA) as a condition of employment. Employees who disclose trade secrets or confidential company information may be subject to disciplinary action, up to and including discharge.

### Requests by Third Parties for Company Information

All inquiries received by the company or TriNet from someone outside the company regarding a present or former employee must be directed to your manager, unless you have specific authority to respond to such an inquiry. No other manager or employee is authorized to release references for current or former employees. The company's policy as to references for employees who have left the company is to disclose only the dates of employment and the title of the last position held. If an employee authorizes disclosure in writing, the company will also provide a prospective employer with the amount of salary or wage last earned.

Also, you may be approached for interviews or comments by the news media, analysts and/or customers/vendors on events and issues that may impact the company image. Only specifically designated contact people should provide responses on behalf of the company in these instances. If you are unsure who should respond, contact your manager immediately.

### Company-Furnished Equipment or Materials

You're responsible for taking good care of the equipment or materials furnished to you by the company, which remain company property and should only be used for legitimate company business. In the interests of maintaining a safe and orderly workplace, unauthorized removal of any company property (or that of another employee) is considered a grave offense, and may subject you to serious consequences, regardless of seniority or past performance. If you leave our employ, you will need to return any company property in your possession.

# EXHIBIT C

From: Munjal Shah <munjal@like.com>
To: Beth Kirsch <bkirsch2000@yahoo.com>
Cc: Amdursky, Eric; Lazarow, Warren
Sent: Tue Jan 15 10:22:11 2008
Subject: Legal Action

Beth,

I called you on this but got vmail.

As we were perusing your laptop for the Saks IO the other day an old IM with dldaddy (David Lewis) suddenly popped up (must have been left open or your computer auto-logged you in). It had had some racial overtones. Upon reading this we decided to read more of your IMs which were logged on the corporation's laptop, of which there were thousands. I was shocked by what I read.

Worst off it seems you have offered to tell David confidential information about Like.com's trade secrets/proprietary information and on a number of occasions have violated the confidentiality of Like.com with outside parties and with subordinates (by sharing board packets, etc). Finally you explicitly indicate that you are stealing software from the company.

After considering this, the board of directors and I have decided that you will be receiving a letter from our lawyer, followed by an injunction and a lawsuit against you by the company. I recommend you do not delete any further IMs or emails as it could be an obstruction of justice which is criminal and could include jail time, per my understanding. Yahoo tends to keep deleted emails for a period of time anyways for the case of such criminal investigations.

On a side note, I ended up reading ALL of your IMs (as I was searching for your IP violations) and am extremely disappointed with the way in which you conducted yourself while here. I have never seen such unethical and even criminal behavior from an executive before.

Munjal